It is further believed by the prisoner's counsel, that if on firing the shot, Baxter had rushed towards him in a threatening manner, and the prisoner had turned, being unable to escape, and slain the deceased, the act had been homicide se defendendo, and this upon the clearest principles of criminal law.
The prisoner's counsel contends: —
First; That if Baxter's shot had killed the prisoner, Baxter would have been guilty of manslaughter at the least. And
Second; This position being established, the killing of *Page 126 
Baxter under the circumstances stated is but manslaughter in the prisoner.
The first position would seem too plain to be argued; but as an opinion appears to be rapidly pervading the public mind, that any means may be resorted to, to coerce the perfect submission of the slave to his master's will; and that any resistance to that will, reasonable or unreasonable, lawfully places the life of the slave at his master's feet, it may be useful to attempt to draw the line, if there be any, between the lawful and unlawful exercise of the master's power. That there is such a line, though it may be difficult in all cases to find it, and fix it with precision, is nevertheless true; and although the Courts may resolve that in all cases short of homicide, they will not look for it, yet disagreeable and perplexing as the task may be, they cannot avoid the search, so long as a master may be tried for the homicide of the slave, or so long as the slave may set up any defence for the homicide of his master.
It is not intended to combat the correctness of the decision in theState v. Mann, 2 Dev. 263, though that case leaves the slave, when his life is spared, in the slender guardianship of the "frowns and execrations" of a moral community against cruelty. That decision is not understood by me as some have expounded it. In declaring that a master cannot be indicted for a battery on his slave, the Court is not to be understood to affirm that he cannot be indicted for any offence which necessarily includes a battery. I apprehend the substance of their decision to be, that they will take no cognizance of any violence done to the slave by the master which does not produce death. It is true, there is a portion of the opinion of the Court which puts the slave entirely out of the pale of the law, and secures the master in a despotic immunity. In page 266, the Court say, "such obedience is the consequence of only uncontrolled authority over the body; there is nothing else which can operate to produce the effect; the power of the master must be absolute to render the submission of the slave perfect. In the actual condition of things it must be so, there is no remedy; this discipline belongs to the state of slavery; they cannot be disunited without abrogating *Page 127 
at once, the right of the master and absolving the slave from his obligation." These expressions, it must be admitted, are clear beyond cavil in their meaning; and that they were selected to convey, with great accuracy, the opinions of the learned Judge who used them, may be well argued from the frank confession which he avows of their abhorrence. In truth, they do outlaw the slave, and legalise his destruction at the will of his master. It is believed, however, that they were never intended to cover the entire relation between master and slave. If they were, it is humbly submitted, that they are not only startling and abhorrent to humanity, but at variance with statute law and decided cases. Uncontrolled authority over the body, is uncontrolled authority over the life; and authority, to be uncontrolled, can be subject to no question. Absolute power is irresponsible power, circumscribed by no limits save its own imbecility, and selecting its own means with an unfettered discretion. Absolute power is exempt from legal inquiry, and is absolved from all accountability for the extent, or mode of its exercise. During its operations, it acknowledges no equal, who may check its will, and knows no superior afterwards, who may rightfully punish its deeds. The language of the Court does not strictly and precisely describe the relations of master and slave which subsisted in ancient Rome, and does now subsist in modern Turkey; a relation which this Court in the case of the State v. Read, did most emphatically denounce, as inhuman, unsuited to the genius of our laws, and unnecessary to protect the master in his legal rights. In that case, Judge HENDERSON fixes the true boundary of the master's power. It extends, says he, to securing the services and labours of the slave, and no farther. And he expressly declares that a power over the life of the slave is not surrendered by the law, because the possession of such a power is noways necessary to the purposes of slavery, and that his life is in the care of the law.
The idea of the perfect submission of the slave is in true accordance with the policy which should regulate that condition of life, wherever it may exist. But whether it will more certainly result from the absolute
power of the *Page 128 
owner, than from a large but limited authority, is questionable indeed. More especially, if it be true, as argued in the opinion already referred to, that the absolute power of the master, although left unrestrained by law, is checked and fettered by what is stronger than law, the irresistible force of public sentiment. If that force is now setting in a counter-current against the license of absolute power, either it is to be deprecated and stopped, or absolute power is most clearly proved to be unnecessary to the ends of slavery. The Courts of the country should foster the enlightened benevolence of the age, and interpret the powers which one class of the people claim over another, in conformity, not with the spirit which tolerates the barbarian who is guilty of savage cruelty, but with that which heaps upon him the frowns and deep excretions of the community. All domestic police must be regulated by the feelings and views of those who dispense it. If it be true then, that public sentiment will no longer tolerate excessive cruelties from the master, as is said by TAYLOR, Chief Justice, in The State v. Hale; by HENDERSON, Chief Justice, in The State v.Read; and by RUFFIN, Chief Justice, in The State v. Mann; and if it be true, likewise, that the relation between master and slave is to be discovered from the opinions and feelings of the masters, we cannot hear, without surprise, that it is necessary in the actual condition of things, to clothe the master with an uncontrolled and absolute authority over the body of the slave. If such necessity now exists, the rhetorician hath spoken, and not the Judge. If such necessity does not exist, the power is given for abuse, and not to accomplish the objects of slavery. It would seem, really, that whilst the Courts are lauding the Christian benevolence of the the times, manifested by the humane treatment of the slaves, they are engaged in investigating to what possible extent the master may push his authority, without incurring responsibility. They feel shocked at the discovery they make themselves, but rise from their labour with the consolation, that few are so abandoned to a sense of public indignation, as to enjoy the revealed prerogative. If the expression could be divested of the appearance of sarcasm, *Page 129 
some truth might, perhaps, be found in the assertion, that the great result of their disclosure has been to teach the kind master, how merciful and moderate he is in the midst of such plenitude of power; and the cruel one, how despised and desecrated he will be, if he use its legal license. Good men will feel no pleasure in the revealment, bad men will be freed from the check of ignorance.
It is further said in the State v. Mann, "that the slave, to remain a slave, must be made sensible, that there is no appeal from his master, that his power in no one instance, is usurped." The language here is equally explicit, and altogether as strong, as that before quoted. It denies to the slave the smallest attribute of a rational or feeling creature. It not only represses thought, and extinguishes all power to deliberate on any command of his master, however repugnant to natural justice it may be, and whether its execution is to affect himself or others; but it professes to control into perfect tameness the instinct of self-preservation. It would be difficult, and if it were easy, it would be lamentable, to accomplish the former; but it would be impossible to effect the latter. Such insensibility to life would defeat the very object of its inculcation, the value of the slave. For we can never hope to regulate this powerful instinct of nature, with an adjustment which will quietly yield all its love of life into the hands of a ferocious master, and yet preserve it against the world beside. But if it were desirable so far to annihilate it, the task is beyond the reach of human ingenuity, and not to be accomplished by the possession of absolute power, however fearfully enforced or terribly exercised. The relation of master and slave may repress all the noble energies and manly sentiments of the soul, and may degrade the moral being into a brute condition; and when this is done, we shall not be astonished to see the moral brute exhibiting the instinct natural to brute condition. How vain must it always be, when we shall have reduced humanity to its ultimate capability of degradation, to expect any embellishment of mind to adorn the wretched existence. If the relation require that the slave should be disrobed of the essential features which distinguish him *Page 130 
from the brute, the relation must adapt itself to the consequences, and leave its subject the instinctive privileges of a brute.
I am arguing no question of abstract right, but am endeavouring to prove that the natural incidents of slavery must be borne with, because they are inherent to the condition itself; and that any attempt to restrain or punish a slave for the exercise of a right, which even absolute power cannot destroy, is inhuman, and without the slightest benefit to the security of the master, or to that of society at large. The doctrine may be advanced from the bench, enacted by the legislature, and enforced with all the varied agony of torture, and still the slave cannot believe, and will not believe, "that there is no one instance" in which the master's power is usurped. Nature, stronger than all, will discover many instances, and vindicate her rights at any and at every price. When such a stimulant as this urges the forbidden deed, punishment will be powerless to reclaim, or to warn by example. It can serve no purpose but to gratify the revengeful feelings of one class of people, and to inflame the hidden animosities of the other.
With great deference to the opinion already commented on, it would appear to me, that a conclusion directly the reverse, as to the necessity of absolute power in the master, should have been drawn from the premises. The slave can only expect to learn the law of the land, as respects the power of the owner over him, from the manner in which it is generally, and almost universally, administered by the owner. If their treatment is now so mild, or becoming so, as rarely to require the interposition of any tribunal for their protection, they will soon be taught by the conduct of their masters, if not already taught, that absolute power is not the master's right; and the consequence which may be expected will be, that the slave will be prepared to resist its exercise, when bad men attempt to commit the cruelties allowed by it. So important is it, that the Court should, as far as possible, conform their exposition of the rights of men with those sentiments of the public, which, by the Court, themselves, are admitted to be wholesome and just. And especially should they do so, *Page 131 
when those rights are constituted by public opinion, and almost exclusively by that alone.
Whatever be the power, however, which the master may possess, it is given with the sole view to enable him to coerce the services of the slave, and all experience teaches us, that a power over the life is not necessary to effectuate that end.
The usual modes of correction are found to be altogether sufficient. Punishment short of death serves the end of the master, both as a corrective and as an example. Power over the life of the slave being therefore unnecessary, ought not to be conceded. The use of highly dangerous weapons in cases of simple disobedience is not tolerated by the law, because they are calculated to produce death.
If the deceased had been resisted, a great degree of force might have been used, and the law would not have been scrupulous in determining the excess. If he had been chastising the prisoner, in the ordinary mode, and death had ensued, it would have been nothing more than an unfortunate accident. But the prisoner was neither resisting his master, nor did the calamity grow out of any attempt to chastise. It is confidently contended, that a master has not by the law of the land, the right to kill his slave for a simple act of disobedience, however provoking may be the circumstances under which it is committed; that if the slave be required to stand, and he run off, he has not forfeited his life. This is conclusive, if the law will never justify a homicide, except it be committed upon unavoidable necessity, and will never excuse one except it be done bymisadventure or se defendendo. There is no principle in criminal law which will justify or excuse the death that has been caused through the provocation of the passions alone.
This Court has repudiated all idea of similarity between the relation of master and apprentice, as understood in the English law, and that of master and slave, as understood in ours. I cannot perceive the propriety of such total repudiation. The foundation of both relations is the same, to wit, service; and although the slave may stand in a lower grade than the mere apprentice, and be more dependant *Page 132 
on his master, yet it is submitted, that the difference is in the degree, and not in the nature of the authority which the master of the one or the other may exercise. This seems to have been the idea of Justice BLACKSTONE, who, in speaking of homicide by parents and masters, caused by immoderate correction, proceeds, "thus by an edict of the Emperor Constantine, when the rigour of the Roman law began to relax and soften, a master was allowed to chastise his slave with rods and imprisonment; and if death accidentally ensued, he was guilty of no crime: but if he struck him with a club or a stone, and thereby occasioned his death, or if in any yet grosser manner, (as by shooting,) "immoderate suo jure utatur, tunc reus homicidii sit." 4 Bl. Com. 183.
It is not my purpose, however, to place the slave and apprentice on the same footing. It is freely conceded that there is a great difference between the two conditions, and that many cases of homicide committed precisely under the same circumstances, would be murder of an apprentice, and only manslaughter of a slave. Thus the master has the right to beat his apprentice as well as his slave, but the principle is universal, with a solitary exception, that a man having the right under a given provocation, to lay hand upon another, but using a weapon calculated to produce death, and death ensuing, is guilty of murder. The exception alluded to is the slaying an adulterer caught in the act. Bevil, 48. Now if an apprentice disobeys, and runs from his master in order to escape chastisement, and the master shoots and kills him, it is murder. Bevil, 51, 52 and 53, and 62 § 2. Surely the slaying of the slave under the same circumstances, after full allowance for the difference in their grade of life, can be nothing less than manslaughter. If the law, for the purposes of policy, will not permit the master to be called to account for batteries, however cruel or unjust, done on the body of his slave, as it does in the case of an apprentice, yet when it is obliged to examine the extent of the master's powers by reason of a death, then it will apply the same reasonable rules in investigating the master's guilt and the slave's conduct and rights, which it applies *Page 133 
in the case of slaying an apprentice, suiting the rule to the difference of condition. 1 Hawks, 217. If, indeed, the master may not be called to account till the death of his slave; if he have this wide scope of authority, to be exercised upon his own discretion, it is highly reasonable, that when he is called to account, the examination should be rigorous, for it is the only protection which the slave can claim at the hands of the law, and therefore ought to be strict, in order that it may be the more efficient. It is here alone, that the slave, in the eye of the law, ascends from the level of mere property, and takes an humble stand amid his species. Here he is regarded as a rational creature. Scott's case, 1 Hawks, 24. State v. Read, 2 id., 454. The necessity of averring that he is property, and whose property, as is requisite in indictments for the batteries of slaves, is here dispensed with; and from this distinction alone it would appear, that the Courts, in the very form of the indictment for murder, have not recognised the exemption of the master from the accountability common to the world beside, for the death of a slave. 2 Dev. 264.
The prisoner was shot in the act of making off from his overseer, who was prepared to chastise him. A master's authority to apprehend his slave cannot be greater than that of a constable or sheriff to arrest for a misdemeanor; and a constable may not kill in order to prevent the escape of one guilty of that grade of offence. The law has so high a regard for human life, that it directs the officer to permit an escape rather than kill. Bevil, 119 § 4, 165. If the officer act illegally, by abusing his authority, or exceeding it, resistance unto death is not murder. ibid. 194. But if the master have greater authority to apprehend his slave, than a law officer hath to arrest, under a precept, for a misdemeanor, he certainly has not greater than a sheriff, acting under a precept, hath to arrest a felon. Here the law again shows its tender and noble regard for human life and its detestation of the shedding of human blood. The officer is not allowed to kill a felon, a murderer, or a traitor, unless his escape beinevitable. Bevil, 114, § 1; 117, § 2. "And in *Page 134 
every instance in which one man can be justified in killing another, the abuse of his power makes him guilty of manslaughter." Ibid. 78. An officer, therefore, having the right to kill a felon, in order to prevent his escape, and doing so when the escape may be prevented by more lenient means, is guilty of manslaughter. Ibid. 114, § 1. This necessity must always be proven. It is never presumed. No such necessity appears in the finding of the jury. In legal contemplation, therefore, it does not exist.
The law enjoins it as a duty on the officer to kill a felon, rather than permit his escape, upon the presumption, I suppose, that if he do escape, he will forever elude the penalty of his crime. Such is not the case with a runaway slave, who, in general, may be certainly recaptured. No one will be found to maintain, that it is the duty of the master to kill his slave rather than suffer his temporary escape. The prisoner was in the act ofdisobedience, and not of resistance, between which there is a substantial difference. Act of 1791; Bevil, 114.
The deceased then greatly exceeded his authority, whether the prisoner is to be considered in the light of an apprentice; of one who had committed an aggravated misdemeanor; or even in that of a felon; and if death had ensued, I conclude that he would have been guilty of manslaughter at the least.
This brings us to the important question in this case. Was the prisonerjustly so provoked by the shooting, as under the influence of ordinaryhuman frailty, to cause his reason to be dethroned, and to be deprived of deliberation? Or, in the language of Judge HAYWOOD, in Norris's case, "was not the prisoner thereby deprived of the free and proper exercise of his rational faculties, owing to the fury of resentment, not unreasonably conceived?" If he was, that ends the question. Was it such a provocation, as, allowing for the disparity of the free and slave condition of men in this country, was well calculated, even in minds tolerably well regulated, to throw a man off his guard, and excite a furious anger? If so, the State
v. Merrill, 2 Dev. 279 (RUFFIN's opinion) determines the fate of the prisoner. An appeal to human nature in its most degraded *Page 135 
state, will answer, unhesitatingly, it was. No man can reason and respond otherwise. And it appears to me, that an appeal to the principles of law, as founded in the nature of man, and recognized for centuries, will leave not a particle of doubt. Can the prisoner be guilty of murder? Who can review the circumstances of the case, and in his candour pronounce that they carry in them, "the plain indication of a heart regardless of social duty, and fatally bent upon mischief?" If his case can be made to reach this standard definition of murder, what bosom is there which does not luxuriate in the poison of murderous thought? And in vain may nature plead her wrongs and the tempest of the passions, to excuse the indiscretion of her fitful moments. It may be murder; but if so, it must find its guilt, not in the human disposition, but in a policy that knows no frailty and shows no mercy. That policy is yet to be declared. I will not suppose its intended application to this case, and I shall, therefore, for the present, take the liberty of discussing the defence upon the received principles which define murder, and distinguish it from manslaughter.
Murder is the felonious killing of a human creature with deliberation. The act must have three intents. 1. An intent to kill or hurt. 2. An intent to kill or hurt unjustly. And, 3. The intent must be deliberate. It is only necessary in this case to consider the deliberation of the intent; for it is admitted that the intent of the prisoner was to kill or hurt, and that it was unjust; but it is denied that it was deliberate.
The intent is not deliberate if there be provoking cause. Bevil, 28 § 1; 34 § 3. The mischievous vindictive disposition, essential to constitute the crime of murder, is implied from the want of legal cause of provocation. The greatest care should be taken not to confound a vindictive
act, and such an act as shows a vindictive disposition. Bevil, 41, and note. Every case of manslaughter, perpetrated in anger, is a vindictive act; whilst every case of murder exhibits the vindictive disposition. A vindictive act simply, is the result of ordinary frailty; a vindictive disposition is the attendant of extraordinary depravity. *Page 136 
The former comes of a surprise of the passions; the latter marshals, stimulates and leads the passions.
Manslaughter wants one of the above intents which define murder. It implies an intent to kill or hurt, and that the intent is unjust, but supposes the absence of deliberation, or the presence of a justly provoking cause. (Cases illustrative of this definition, Bevil, 64, 65. 67 § 5, 68. 74 § 2, 76 § 3. Stedman's case, p. 80. Carey's case, p. 124.) But what is justly provoking cause? In our search for the meaning of the expression, we cannot consult the vague notions of men, as to insults. There would not only be no certainty in them as a guide, but they would strip men of all security for their lives. We must appeal to the common law as it has recognised excusable frailties. Its principles being bottomed on human nature civilized by legal restraints and legal privileges, adopt themselves with a happy facility, to all the changes and modifications of society, and to all the mutations in the relations of its parts. These principles having discarded the idea of legal provocation from words, have resolved the foundation of their existence into the protection of the person.
Self-preservation, being a prime law of nature, and indispensable to the first and permanent interests of society, the instinct is fostered instead of being checked. The policy of the law to cherish it, is what dispenses indulgence to an excess of force requisite to preserve it, and palliates an unnecessary homicide. If human institutions could so blunt this sense as to effectuate a law which should forbid blow for blow not threatening death, the introduction of slavery, to a great degree, would be already prepared. If, however, the degradation should stop at this point, still there would be a very ample scope for this powerful sense to act in, and a dangerous attack, or a blow menacing death, being out of the customary sufferance, would call up, in vigour, the unsubdued though mutilated sense, and surprise it into action. It is not the object of the law, in its regulation of the relation of master and slave, to destroy any portion of the instinct of self-preservation. On the contrary, it would be rejoiced to preserve it entire, but this is inconsistent with the subjection of the slave, without *Page 137 
which he is valueless. If this instinct were permitted to be displayed by the slave, as by a freeman, the authority of the master would be at an end. Hence it is, that when it is not so essential to be curbed, it it allowed to enjoy a wider range; as in respect of strangers who have no right to assume any authority, it is permitted to turn many degrees towards the condition of freemen. And hence it is too, that whenever the law, for the purpose of sustaining the relations of the several parts of society, deemed essential to the peace and safety of the whole, tolerates its partial suppression, it provides the best possible security against any abuse likely to occur because of its required extinction. Thus it gives to the wife, the protection of love and identity of welfare; to the child, the shield of affection; to the apprentice, the guaranty of a penal bond; and to the slave, the guard of interest. In the general, in proportion as these securities are weaker, that of the law itself ought to be stronger; and in proportion as the subjection in the one or the other of these relations, is required to be greater or less, so must the suppression of this instinct be greater or less. The subjection in the relation of slavery ought to be greater, and so ought the extinction of the instinct to be greater, than in any of the other relations. It is the legal duty of all who are subjects, in any one of them to adapt and conform this instinct to the extent necessary to maintain the relation; and if any one do not, he shall not plead its want of subjection in excuse of a deed occasioned by his neglect of duty. If an apprentice, being under a lawful correction, shall resist and slay his master, it is murder and not manslaughter, because the law cannot admit that he was provoked. If a slave be under any correction, with or without cause, from his master, provided it do not threaten death or great bodily harm, and he resist and kill his master, this is murder likewise, and for the same reason, as the law requires this degree of submission from him. But if the apprentice be unlawfully beaten, and he resist and kill his master, it is not murder, because the law hath not required him to extinguish his instinct of preservation to such an extent, and therefore, it admits that he was *Page 138 
provoked; so if a slave be beset by his master in a manner to threaten death, and he slay his master, this cannot be murder, because the law hath not required him to extinguish his instinct to so great a degree, and therefore it admits that he was provoked. In a word, in those bounds within which the law has enjoined it as a duty to curb the instinct of self-preservation, we are not allowed to display it, and if we do, the law cannot hear the defence of provocation; but all display of it out of those bounds, is admissible and is the effect of legal provocation. The law demands it as a duty that we should tame our passions to suit the condition which it has assigned us. It supposes that this duty will become habitual, and consequently of easy performance, that we will conform ourselves to its requirements. This, and this alone, is the true foundation of all the distinction between the master and the apprentice, between the freeman and the slave.
But having conformed ourselves to a given and required degradation, to an enjoined submission, we are ready by our very nature and habits, to resist any degradation or submission greatly beyond that which we have learned to acquiesce in as a duty. When a slave is required to bare his back to the rod, he does it, because it is usual; but when he is required to stand as a target for his master's gun, he is startled: no idea of duty sustains the requirement, and the unquelled portion of his instinct rouses his passions to resistance.
Human institutions are inadequate to the task of settling a condition in society which shall impart to its members the highest perfection of philosophic fortitude and the lowest degradation of animal existence; which shall blend into harmony the reasonable man and the passionless brute.
When it is declared that a slave is a reasonable or human creature, as in State v. Scott, State v. Hale, and State v. Read, and that he is the subject of felony at common law; that murder and manslaughter both may be perpetrated on his person; that himself may commit both, it would seem to result that he was acknowledged to possess the human infirmities common to his species. That they must *Page 139 
be palliated in some cases, even when the master is the victim, I hope I have satisfactorily shown. And I now come to the deliberate conclusion, that the only difference caused by the relation consists in the fact, that there are some acts of the slave which constitute provocation, that would not, if done by a freeman; some which would constitute provocation to themaster which would not to a stranger; and on the contrary, that a slave is not permitted to be provoked at many acts done by a stranger freeman, which would constitute a lawful provocation if done by a fellow slave; and that a great variety of acts, done by the master, shall not be sufficient cause of provocation, which, if done by a stranger, would so be deemed. But that not in a single relation in which the slave is placed by the law, is he debarred in every case of violence to his person, from feeling and pleading a legal provocation.
If I have been successful in showing that the deceased greatly abused his authority by shooting at the prisoner, and that the act was calculated to produce a resentment not unreasonably conceived, the inference in law is irresistible, that if the prisoner, immediately on being shot, had turned and slain the deceased, it could not have been more than manslaughter; and the only important point now remaining to be discussed, is, whether the interval of time between the reception of the injury and the commission of the homicide, enhances the guilt of the deed. The law would be vain and nugatory as a rule of action, if it should allow that the passions may be justly provoked, and yet refuse to allow a reasonable time for their subsidence. When it says that reason may be dethroned, it is never guilty of the solecism of holding the judgment accountable, till reason can be reseated. Whether there may have been sufficient time for that important operation of the faculties, is a question often dependent on the circumstances of the case. The continuance of the original exciting causes and the addition of subsequent stimulants, being necessarily calculated, to prevent the restoration of reason, may prolong the time till they cease to exist; nor even then, at the very moment of their cessation, does the law demand that the bosom shall return to its calm and *Page 140 
tranquility. Such an instantaneous repose is no more to be looked for, in the tempest of the passions, than it is in the storms of the ocean, whose angry waves are often seen to run mountain high, long after the dark cloud hath passed away, and the raving wind hath fled from the conflict, leaving its enraged victim heaving with agitation beneath a tranquil and sunny heaven.
The time in this case was but six or eight minutes, and the wound calculated to produce death. If the exciting cause of provocation had here ceased, it would be a rigid and unnatural rule, to require, at the expiration of this short period, the presence of a responsible judgment; for it is perfectly apparent, that in proportion to the severity of the injury received, will be the length of time which nature demands to adjust the shaken balance of the mind. The prisoner had much cause to suspect that his wound would prove fatal; and no man, either bond or free, labouring under the excitement incident to such a situation, could, so soon, have quelled his fury, and recalled his scattered senses. But these few moments were not allowed to be moments of rest and thought to the wounded man. They were moments of flight and active pursuit; flight, by a man dangerously shot, his wounds bleeding in profusion, and chafed into agony by the friction of his clothes and the motions of his body; pursuit, by a man who had meditated and attempted a deadly injury; who called to his aid three more men, ready to execute his purposes whatever they might be; who was well aware of the mangled condition of his victim, and who under the full conviction of his shot proving fatal, cheered his comrades of the chase, by the unfeeling exclamation, "he can't run far." Let it be remembered too, that the prisoner, during this space of time, had run a distance of five or six hundred yards; that he was overtaken by a man, who, in moments perfectly cool, when compared with those in which he captured the prisoner, had not hesitated to shoot him at a distance of a few rods, and by what logic can we arrive at the conclusion, either that the prisoner had enjoyed opportunity to regain his judgment, or that he had not every reason to apprehend from the deceased the finishing stroke to his *Page 141 
life. How could he be trusted, with every passion inflamed to madness, who, in cooler times, had violated every duty; as a man, had deliberately prepared himself to take the life of his fellow man; and, as a superintendent, had, for trifling cause, attempted to destroy valuable property entrusted to his care? In no part of the slave's conduct does he evince a disposition to seek a conflict. He takes every occasion to avoid it. When he is headed, he does not hesitate to turn his course, and flee from an encounter.
Upon the whole, I cannot bring my mind to the conclusion, that this case is of higher grade than manslaughter, if of that; and whatever may be the prisoner's fate, I am free to declare, and with the most sincere candour, that I do not recognise in his conduct, the moral depravity of a murderer, nor any high degree of inaptitude to the condition of slavery. He was disobedient, it is true, and ran to avoid chastisement. Three-fourths of our slaves occasionally do this. He slew his overseer, it is true, after having been dangerously shot, pursued and overtaken. The tamest and most domestic brute will do likewise. And I feel, that if he must expiate the deed under the gallows, he will be a victim, not of his own abandoned depravity, but a sacrifice offered to the policy which regulates the relation of slavery among us. But before he is sacrificed, it may be useful to inquire into that policy. The interests of society demand that it should be fixed, and permanently fixed, that the master may know the extent of his authority, and the slave prepare himself to its accommodation.
No question can be more delicate, or attended with so many bad consequences if settled in error. It would be next to impossible for the judiciary to adjust this relation adversely to any strong and deliberate opinion entertained by the public mind. The momentum of this feeling acting through the juries of the country and the spirit of the legislature, would be too powerful, successfully to be encountered by the Courts. And in whatsoever decided current it might run, it would, finally, bear into its channel all interpretations of the law.
By a timely and judicious administration of the law, however, in relation to this subject, the Courts may effect *Page 142 
much in the formation of public opinion, and at this time they may exert the opportunities afforded by their situation, in a most happy manner to impart fixedness and stability to those principles which form the true basis of the policy. They have of late frequently announced from the bench, the progression of humanity in the relation, and their clear conviction, that the condition of the slave was rapidly advancing in amelioration, under the benign influence of Christian precepts and the benevolent auspices of improving civilization. It is believed, that these convictions were founded in truth, and the various laws on the statute book bring ample testimony to the fact. As far as slavery has been the subject of legislation for the last ninety years, it has been undergoing a gradual revolution in favour of the slave, and, it is confidently asserted, not adverse to the best interests of the master, or of the security of the public. In a popular government, we can nowhere look for more correct information of the state of the public mind, upon a subject deeply interesting to the people at large, than in their laws. The history of the legislation of the state for the last century on this subject, during which more than a dozen principal acts have been passed at intervals, is a history of a gradual progression in the improvement of the condition of the slave, in the protection of his person, his comforts, and those rights not necessary to be surrendered to his master. The length of time in which this evidence of a common sentiment has been continuing in one course, is irrefutable testimony of its being the true and deliberate sense of the community. Very lately the whole subject came before the legislature; and though it was at a time when the public mind was inflamed and alarmed at a recent and yet reeking massacre, they did not relax the laws made for their protection, nor render their lives or persons less secure. From the act of 1741, which put the life of the slave on trial, in the hands of three justices and four freeholders, down to that of 1831, which secures, beyond doubt, the right of the slave to a jury of slave owners, there will be found, without a solitary retrograde, one continued, persevering and unbroken series of law, raising the slave higher and higher *Page 143 
in the scale of moral being. To the period of 1794, the character of the acts, though they are not numerous, nor strongly marked with exclusive benefit to the slave, is evincive of an intent to afford protection, where before it was weak. From that period, however, it may not be uninteresting to furnish a brief synopsis of them, in a case so important as this. (Here the several acts alluded to were reviewed.)
It is not possible that there can be found, anywhere, a plainer manifestation of a decided intent to raise the consideration and standing of the slave, than is here exposed in the foregoing acts of the legislature. Will the Court disappoint this unequivocal intention? Will they rebuke the spirit of the age, and strike back this unfortunate race of men, advancing from the depths of misery and wretchedness, to a higher ground, under the shield of so much legislation enacted in their behalf?
Our laws furnish incontestable evidence of what is the enlightened sentiment of the state. The history of other nations affords a body of luminous information, to instruct us what that sentiment should be; and I feel no small pleasure in believing, that the legislative policy of our past and present day most fully accords with that course, which the long tried experience of bygone ages has distinctly marked out as the wiser and better one.
Upon this subject, the Baron Montesquieu has gathered the choicest materials of every age, clime, and nation. With a mind, formed in the mould of patience itself; strong by nature, and enriched with a philosophic cultivation, he hath executed the task of analysis with the most profound and discriminating sagacity. With no object in view, but the advancement of political knowledge, he hath unmasked all the forms of government, traced to the fountain the principles of their action, and exposed to the meanest capacity the deep and hidden reasons of all the diversified relations of man, and the true genius of the laws necessary to support them.
In his Spirit of Laws, vol. 1, p. 291, et seq. to 298, he treats of the subject of slavery, and informs us, as the result of his inquiries, that in governments whose policy *Page 144 
is warlike, and the citizens ever ready with arms in their hands to quell attempts to regain liberty, slaves may be treated with great rigour and severity, without the hazard of servile wars; but that in republics, where the policy is essentially pacific, and the citizens devoted to the arts of peace and industry, the treatment of slaves should be mild and humane: that the power of the master should not be absolute, and that the slave should be put within the keeping of the law. If that candid and ingenious writer be not deceived in his conclusions, he has given us a hint for the regulation of our domestic servitude, the neglect of which may lead to the most fatal sequel. Our government is, perhaps, the most pacific on earth, and the citizens most addicted to the pursuits of civilized life. How inconsistent, then, will it be in us to adopt a policy in relation to our slaves, which must be either yielded up, or must change the habits and character of our people, and ultimately our form of government, with the blessings of liberty itself.
We may not expect that the danger of servile wars will only operate to arm the citizens, generally, in their own defence. The recent insurrection may show, indeed, the formation of numerous companies of yeomanry for the purpose of being always ready to meet and vanquish the earliest movements of insurrectionary slaves; but a little observation at this time, so soon too after the panic that gave rise to these preparations, will serve to show, that at the present moment, there remains scarcely a single one of the many associations which were then formed. They grew up with the panic, and they have vanished with it. It must be apparent, then, if ever-ready arms are necessary to our safety, they must be lodged in hands not filled with other occupations, but responsible to the public for efficiency and dispatch. In other words, if a display of force be requisite to chain down the spirit of insurrection, or stop the bloody career of its actual march, a standing army, which will leave the great body of citizens to pursue their favourite occupations of peace, in perfect security, will be the loud demand of the community. How certainly such a permanent association of armed men, first formed to preserve the relations of our slavery, will ultimately introduce *Page 145 
a civil slavery over the whole land, the experience of other nations, and the warning of our own Constitution will most fearfully answer. I know it has been frequently said, and with some it is a favourite idea, that the more cruel the master, the more subservient will be the slave. This precept is abhorrent to humanity, and is a heresy unsupported by the great mass of historic experience. The despair of individuals cannot last forever; neither will that of a numerous people inflicted with common wrongs, and exchanging a common sympathy. Rome had no servile wars, till her masters had outraged every feeling of justice and benevolence, and made their slaves drink the cup of unmitigated cruelty to its last drop; nor had she any, that I remember, after the first Christian prince of the empire, had relaxed the intolerable degradations of that unfortunate class of her people.
I feel and acknowledge, as strongly as any man can, the inexorable necessity of keeping our slaves in a state of dependence and subservience to their masters. But when shooting becomes necessary to prevent insolence and disobedience, it only serves to show the want of proper domestic rules, but it will never supply it; and never can a punishment like this effect any other purpose, but to produce open conflicts or secret assassinations.
In adjusting the balance of this delicate subject, let it not be believed that the great and imminent danger, is in overloading the scale of humanity. The Court must pass through Scylla and Charybdis; and they may be assured that the peril of shipwreck is not avoided, by shunning with distant steerage, the whirlpool of Northern fanaticism. That of the South is equally fatal. It may not be so visibly seen; but it is as deep, as wide, and as dangerous.
2. If this would be the case between equals, let us next *Page 146 
consider it as occurring between freemen not standing upon an equal footing, but between a superior and an inferior, a master and his apprentice, or between persons one of whom has a right to command the services of the other, and chastise him for the purpose of enforcing obedience to his commands.
The distinction in cases of this kind seems to be this: where the party having the right to chastise the other, uses no unlawful or deadly weapon in inflicting the chastisement, and does not appear to aim at his life, there, if death ensues, it will be murder or manslaughter according to the degree of violence used. Vide Nailor's case, 1 East, P. C. 261, 277. But if the party undertaking to chastise or punish, uses a weapon likely to produce death, and death ensues, he is guilty of murder if he slay the other. Bevil, 48. 74, 75, 76. Or if he be slain under such circumstances, the slayer is excusable. Vide Nailor's case, ubi supra.
3. If this be the true distinction as between freemen, and it is confidently believed to be so, let us next inquire what difference is produced by the circumstance of the slayer being a slave, and the party slain occupying the relation of master.
Slaves seem formerly to have been regarded in this state as mere chattels, and not only the master or owner, but any person might kill them, however maliciously, without subjecting himself in the case of the master or owner to any penalty whatever; and in the case of a stranger, to no other than a civil action from the master to recover the value of the slave. We accordingly find the act of 1741, which is the first act on the subject of killing slaves, after providing a remedy for the owner for the loss of a slave killed in dispersing an unlawful assembly of slaves, saves to the owner his right of action against any one killing a slave contrary to the provisions of that act, evidently regarding it as no offence against the criminal law. And this view is also taken by HALL, J. in State v. Boon, Tayl. 253, in which he held that killing a slave was no felony at common law.
The first action of the legislature, making it an offence against the criminal law, was in 1774, when by an act, the *Page 147 
preamble of which recites, that "Whereas doubts have arisen with respect to the punishment proper to be inflicted upon such as have been guilty of wilfully and maliciously killing slaves," it is enacted, that for the first offence the offender shall suffer twelve months imprisonment; and for the second shall be guilty of murder, and suffer death without benefit of clergy. The second section provides that he shall pay the owner of such slave, on the first conviction, such sum as may be assessed to be his value, — still evidently regarding it more as a loss of property than as an offence against the criminal law.
Such continued the law until the year 1791, when the legislature seem to have become ashamed of their previous legislation on this subject, and by an act, the preamble of which recites, "that the distinction heretofore drawn between the murder of a white person, and one who is equally a humancreature but merely of a different complexion, is disgraceful to humanityand degrading in the highest degree, to the laws of a free, Christian and enlightened country," the same punishment is imposed for the wilful and malicious killing of a slave, as for that of a freeman. It is true, this act, owing to the vague and uncertain terms in which it was couched, was never carried into execution. Still it is evidence of the change of opinion and policy which had taken place in the community as to this unfortunate class of beings, at that day.
Divers other acts ameliorating the condition of slaves, removing them from a level with brutes and advancing them more nearly to a level with the whites, were passed between that time and the year 1817; still it will be found that no legislation had yet made or attempted to make any other than the wilful and malicious killing of slaves indictable; accordingly in State
v. Piver, 2 Hay. 79, the prisoner though admitted to be guilty of themanslaughter of a slave was discharged, the Court holding that no punishment was affixed by law to that offence. And the same doctrine is recognised by TAYLOR, C. J. in State v. Tacket, 1 Hawks, 217.
In the year 1817, however, the legislature determining to abolish the last remnant of that barbarous and inhuman *Page 148 
spirit, which had previously characterised their legislation, placed the killing of a slave on the same footing, under like circumstances, with the killing of a free man.
Our Courts too, in further pursuance of this liberal and enlightened spirit, in 1823, (State v. Read, 2 Hawks, 454,) held (contrary to the opinion of one of its members, as delivered in State v. Boon,) that the murder of a slave was indictable at common law; and still further, in Statev. Hale, 2 Hawks, 582, that an unprovoked battery committed by a free man, (not being the master) upon a slave was indictable.
These various acts both legislative and judicial, have been adduced for the purpose of showing, that however a mistaken policy or want of humanity may have actuated the proceedings of the former branch, or influenced the decision of the latter, in the earlier stages of our society, these feelings and opinions no longer prevail; that slaves are no longer regarded as mere brutes or chattels, but that they are now viewed both in the eye of the law and of society, as human beings, liable to be operated upon by the same passions, subject to the same infirmity, and under the protection of the same laws with the white man. If then he be a human being, and that he is, is declared (if a judicial decision upon this point be required) by the act of 1791; by JOHNSTON and TAYLOR, Judges, in State v. Boon; by HENDERSON, J. in State v. Read; and again by TAYLOR, C. J, in State v.Hale; if he be a human being, a reasonable creature, within the protection of the law, are not the same rules of construction to be applied in his case, in ascertaining his guilt or innocence? Should not the same allowance be made for the infirmity of his nature, the operation of his passions, the excitement of his feelings, that is made in the case of a white man? Kept by the stern policy of our laws in a state of ignorance, rude and uncultivated, without any of the aid to be derived from education, or the mild and benign principles of religion, is it just, is it reasonable to require him to exercise a greater degree of control over his feelings and passions, than one who has enjoyed all these advantages?
But it is said, that policy, and the state of our society, *Page 149 
require that these rules, which it is conceded, will and must be regarded in the case of a freeman, should be laid aside when a slave is the subject of their operation. I ask where is the authority which authorises such a conclusion? it can be found no where. So long as he is admitted to be ahuman being, and endowed with the same faculties, he must be treated as such, is liable to the same penalties, and entitled to the same clemency in passing upon his offences that other human beings are.
That his passions are not subject to be aroused by the same causes and circumstances, which would arouse those of a freeman, is freely and fully conceded; but to say that no circumstance, however aggravating, no injury, however great, can possibly, or ought reasonably to arouse or inflame his passions, is requiring what the sober judgment and unbiassed reason of every honest, conscientious man, must tell him is contrary to the laws of nature, and what no human law, however rigorous or severe in its enactments, can possibly effect. All law should be founded on reason; and when we are led to a conclusion so utterly absurd, and so manifestly contradictory to reason, it is time that we should look around, and at least suspect that we have mistaken the meaning of a law, which leads us to such results.
I have before stated (what will be admitted by all,) if this homicide had been committed by one freeman upon another, each of whom occupied the same station in society, or even by a freeman occupying an inferior station upon his superior, that in either case under the circumstances here found, the slayer would have been justifiable; it now remains to examine what difference is produced by the fact of the slayer being a slave, and the slain his master.
It is not contended, nor is it necessary to contend, that the slave should be placed on the same footing with the freeman, and that the same rules should be applied to him in ascertaining the nature and grade of his offence, that would be applied to the freeman. This would be contravening decisions which are now too firmly established to be shaken, and which policy alone requires should be adhered to. But it is urged that neither policy, nor the state *Page 150 
of our society requires that so broad and invidious a distinction should be drawn between the two classes, as that which would go to establish the principle, that the same act which would in the case of a freeman be declared justifiable, or excusable, should, in that of a slave, be held the foulest murder.
It is believed, however, that there is no necessity for resorting to either of these two extremes, but that the true rule will be found in the mean between them, and in the principles recognised and adopted by this Court in Tacket's case. Wherever slavery exists, a broad and acknowledged distinction must be marked out and observed, between the slave and the freeman; and many acts which if committed by one freeman upon another would not mitigate or extenuate a homicide, in the case of a slave will have that effect. It is impossible, as is said in that case, to define and designate these acts, each case must depend upon its own circumstances. Menacing or provoking language from one freeman to another, will not justify an assault; but such provocation given by a slave to a white man, will, it is said, amount to a justification. Apply this rule to all other offences; let it be held also, that what in the case of a freeman would be justifiable, or excusable homicide, will in that of a slave, amount to manslaughter; and what would be manslaughter in the freeman, is murder if committed by a slave; and in this way, it is believed, a sufficiently broad and marked distinction will be drawn between the two classes, to secure the dominion of the one, and the subserviency of the other, and at the same time to afford to the slave all necessary protection against acts of lawless violence and outrage. Apply this rule in all its severity to the present case; make all the allowance which can be asked for the difference in the condition of the freeman and slave, and then make the smallest grain of allowance for the weakness of human nature, and it is impossible that this can be pronounced to be more than a case of manslaughter.
But it is insisted, that the deceased did nothing more than he had a right to do, used no other means than such as the law clothed him with; in other words, that he stood *Page 151 
in the place of master of the slave, and as such had absolute power and authority over the body and life of the prisoner, and that the exercise of that authority cannot be called in question by any earthly tribunal. If such be indeed the law, it must follow as a necessary consequence, that as the deceased had a right to resort to whatever means his fancy or passion might dictate in the infliction of his chastisement, the prisoner had no right to raise an arm in self-defence, and therefore the offence being committed by him in the deliberate prosecution of an unlawful act, it must be murder. If such be the law, abject and degraded indeed is the condition of the slave, and fearful must be the punishment reserved by another and an unerring tribunal, to be inflicted upon such as avail themselves of their fancied immunity here, to trifle and tamper with the lives of those whom our laws have placed in a state of such utter and abject subjection. But if such be the law, how could it ever happen, that a master should even be put upon his trial, for the murder of his slave, however deliberate, wilful, or malicious the act may have been? yet there certainly have been many instances of masters being tried for the murder of their slaves.
The position here contended for, is founded on the expressions used in the opinion of the Court, in the State v. Mann, 2 Dev. 263; expressions strong, certainly, and apparently unequivocal in their import, but which I cannot but believe have been misunderstood in their application, if carried to the extent which is now contended for. It is to be observed, that the only question then before the Court, was as to the liability of the master to answer criminally for a battery committed on his slave, and this is all which was intended to be decided. The language used is certainly sufficiently strong to convey the idea that the master has complete, absolute, and uncontrolled authority over his slave, but these expressions were used with reference to the matter then before the Court, besides being afterwards qualified by the words "except so far as its exercise is forbidden by statute;" and the killing of a slave is clearly forbidden, except where he offers resistance to his master, or where death *Page 152 
occurs in the infliction of moderate correction. But without the aid of statutory provisions, it cannot be conceded, that the position here taken is correct. If the Court intended, as it is believed they did, to say that the master possessed full and complete power and authority to secure the services and insure the obedience of the slave, this is admitted: but if this power and authority were held to extend so far as to take the life of the slave, or even to place it in jeopardy, except in the cases before mentioned, it is submitted, that no such power is necessary, or ought to be granted to the master; that no such authority is conferred by any legislative enactment or judicial determination; but that all our modern legislation and adjudication previously to the case of State v. Mann, have had a directly contrary tendency.
The counsel then directed the attention of the Court to the following cases: State v. Boon, Taylor, 258. State v. Weaver, 2 Hay. 54. State v.Read, 2 Hawks, 455. State v. Hale, 2 Hawks, 582. In this last case, TAYLOR, C. J., recognises the master's complete authority for all purposes necessary to enforce the obedience of the slave, and says that the law will not lightly interfere with the relation thus established. But if a case be brought before the Court in which this authority of the master has been exceeded and his power abused, then, it is contended, the Court must
interfere, and inquire into the circumstances, and this inquiry must arise, whenever the attempt to exercise this authority unfortunately terminates in the death of either the master or slave.
If the master has no right, then, to take the life of his slave, except when he resists him by force, or when the death takes place while the usual punishment is inflicting, it is conceived, that until the occasion occurs which calls for the exercise of this extreme power — until the necessity actually exists — the master or person representing him has no right to resort to means, or to use weapons likely to produce death, and the very moment he does so, he is guilty of an abuse of his power, and if he slays the slave under these circumstances, he is guilty of murder. While *Page 153 
on the other hand, the laws of nature and reason must permit the slave under like circumstances to use and call into action the common instinct of self-preservation, or at least, if he does resort to it, they will not, cannot, esteem him a murderer, if he unfortunately slays his oppresser, in obeying the impulse of nature, which is, in this instance, too strong to be repressed by any restraints which the laws of man can impose.
It will be necessary to consider the relation of master and slave, in this state; the rights and dominion of the one, and the duty and submission of the other. What right and dominion then, by the laws of North Carolina, does the master possess over the slave?
It is conceded that the master has no right to take the life of the slave under such circumstances, as would indicate that malice essential to murder, or a felonious intent. Subject to this restriction, I hold that his authority is absolute and uncontrolled. In establishing this position, it will be necessary to consider what was the state or condition of slavery when first introduced among us, and the regulations to which it has been since subjected.
Slavery in some sort or other, has existed in many portions of the habitable globe from an early period of the world, to the present day. It has been remarked, "That the world when best peopled, was not a world of freemen, but of slaves." It existed among the favoured children of Israel, in Egypt, Assyria, and Babylon; also in Greece and Rome. The boors of Denmark, the traals of Sweden, and the serfs of Russia, have presented specimens of slavery in those countries respectively. The villains of England were in many respects in the condition of slaves. In some countries, it has existed in the most absolute and despotic form; such is the state of slavery in Africa.
In 1620, a Dutch ship, availing herself of that freedom of commerce, then but just extended to the colony of Virginia, brought to Jamestown, and sold as slaves twenty *Page 154 
Africans. In 1624, the government of the colony devolved upon the King, (James 1st.) who, it is said, as well as Queen Elizabeth before, and Charles 1st, and 2nd, and William 3rd, afterwards, encouraged the African slave trade, by chartering companies to carry it on; while the governors of the colonies were forbidden to sanction any law against the introduction of slavery. Thus slavery was first introduced into this country, and, as I apprehend, the legal foundation laid of our right to slave property.
From the origin of slavery, it was probably absolute when first introduced. The slave trader acquired from the slave holder in Africa, that absolute authority and dominion which he possessed, and transferred the same to the colonial purchaser.
But if the opinion of TAYLOR, Judge, in the case of the State v. Boon, Tay. Rep. 246, and of TAYLOR and HENDERSON, in the case of the State v.Read, 2 Hawks, 454, be correct, absolute slavery has never existed in this state, indeed could not. In the case of the State v. Boon, TAYLOR, Judge, used the following language: "I cannot yield my assent to the proposition, that a new felony is created by the act of 1791, or that any offence is created, which did not antecedently exist. For the killing of a slave, if attended with those circumstances which constitute murder, amounts to that crime in my judgment, as much as the killing of a freeman. What is the definition of murder? The unlawful killing of a reasonable being, within the peace of the state, with malice aforethought." The reasoning in the case of the State v. Read, is substantially the same.
I must here remark, that the definition of murder relied upon by the learned Judge to sustain his position, is taken from the laws of a country, where slavery, as with us, is unknown, and where, it is said, it cannot exist. The reasonable being within the peace, to whom it was intended to apply, was a subject of the king. There were no others to whom it could apply. It has been made to apply, it is true, to the killing of a villain, as well by his lord, as by another; but a villain was regarded as a subject of the *Page 155 
crown; and though the lord had an interest in his services, yet for many purposes he was a freeman.
Although the law in its present advanced state of humanity and religion, has thrown the mantle of its protection around the life of the slave, as well against the wanton and unprovoked cruelty of the master, as of the stranger, with additional protection against the latter, yet he is regarded as property; may be the subject of traffic; will pass under the description, goods and chattels; and is liable to be sold by virtue of an execution against the master. Is it improbable then, that a slave acquired by transfer from him, who it cannot be doubted, was possessed of absolute authority, and at a time when the African slave trade was stimulating the cupidity of the nations of Europe, was regarded in the light of property, rather than as a human being, entitled to the benefit and protection of the law?
If it be insisted that our Courts of justice are bound to apply the principles of the common law to the killing of a slave by his master, independent of any legislative enactment, is there any reason why they should not be applied to him, as a human being, under the protection of the law, in a question of property? But to insist upon such an application of the principles of the common law, would be to annihilate all right to this species of property. For although it was adjudged in the fifth year of William and Mary, that trover would lie at common law for a negro boy, yet in the case of Chamberlain v. Harvey, Ld. Raym. 47, and Smith v. Gould, Ib. 1274, and Salk. 666, it was determined it would not, on the ground that one could not have such property in a negro, as to maintain this action.
It is true, that absolute slavery is inconsistent with the moral law; and if it were impossible for municipal regulations authoritatively to enjoin, or tolerate, anything not sanctioned by the principles of morality, that would be a conclusive argument against its introduction. It is desirable, however, that the laws of political societies, should, as far as can be, conform to the moral law, but some must, in the nature of things, rest for their justification, or excuse, in principles of policy. Many municipal regulations are *Page 156 
arbitrary in reference to the natural or moral law, and adopted with a view to the great ends for which civil government was instituted. Writers differ as to the foundation of the right of property, to the extent to which it is allowed in civilized communities, even in relation to inanimate objects; some referring it to the law of nature, others to the law of society.
In the case of the State v. Boon, the contrary opinion to that of TAYLOR, Judge, is maintained with great ability and force of argument, by Judge HALL, a man conspicuous for his humanity, and the benevolence of his disposition.
The position that slavery as at first introduced among us, was absolute, derives additional strength from the legislation of the country. In 1774, the legislature passed an act for the purpose of removing the doubts then entertained as to the punishment proper to be inflicted, for wilfully and maliciously killing slaves, and prescribes for the first offence of the kind, twelve months imprisonment, and for the second, death, as in case murder. Iredell's Rev. 1715 to 1789, p. 274. Judge HALL, in his opinion in the case of the State v. Boon, remarked, "what the powers of a master were over his slave prior to the year 1774, have not been defined. I have not heard that any convictions and capital punishments took place before that period for the killing of negroes." In 1741, an act was passed, making it death for slaves conspiring to rebel, or make insurrection, or murder any person, and providing a Court of three Justices and four freeholders, to try such offences in a summary way, and without the intervention of a jury; and in sec. 55, of the same act, it is provided, that nothing therein contained, shall be construed, deemed, or taken, to defeat or bar the action of any person or persons, whose slave or slaves shall be killed by any other person whatever, contrary to the true intent and meaning of this act. Ib. 94 and 95. From the provision of the above acts of assembly, it appears that a wide distinction was recognised between the life of a white man and slave, previous to the year 1774; and that an action could be maintained previous to the year 1741, by the owner against a person for killing his slave; for the object of sec. 55, was *Page 157 
to guard against such a construction of a previous section, as would bar or take away the action for damages which previously existed. Now when it is recollected, that according to the common law of England, when a felony is committed, the civil remedy is merged in the felony, and never otherwise settled in this state, until within a few years, in the case of White v.Fort, 3 Hawks, 251, the inference is strong, if not irresistible, that the killing of a slave was not felony, until it was made so for the second offence by the act of 1774. It is also remarkable, that the act of 1774, takes care to recognise and enforce the civil remedy for damages for the first killing only, and not for the second. Why not for killing the second slave, as well as for the first? The injury to his owner was as great as to the owner of the first. It must have been, because the second killing was made felony, and the civil remedy was merged in the felony, according to the principles of the common law, which, in this respect, the legislature did not think proper to alter.
The act of 1791, Rev. ch. 335, sec. 3, complains of the act of 1774, as being disgraceful to humanity, and enacts, "That if any person shall hereafter be guilty of wilfully and maliciously killing a slave, such offender shall upon the first conviction thereof, be adjudged guilty of murder, and shall suffer the same punishment as if he had killed a freeman;Provided always, that this act shall not extend to any person killing a slave outlawed by virtue of any act of assembly of this state, or of any slave in the act of resistance to his lawful owner or master, or to any slave dying under moderate correction." It was the intention of the legislature in passing this act, to punish the malicious killing of a slave, with death; but such was its phraseology, that when the principles of the criminal law were applied to it, it failed of its object. The act speaks of the wilful and malicious killing of a slave, and did not therefore embrace a case of manslaughter, that offence not being attended with malice. State v. Piver, 2 Hay. 79. State v. Tacket, 1 Hawks, 210. And when the killing was wilful and malicious, by prescribing such punishment as was inflicted for killing a freeman, such doubts arose, as *Page 158 
would not warrant the punishment of death. For the killing of a freeman, might be either murder or manslaughter, being attended with different punishments. Besides, when a new felony is created, the benefit of clergy is incident, unless it be expressly taken away. The proviso contained in the act, excepts among other cases, that of the lawful owner or master, killing his slave in the act of resistance. Now this proviso upon principles of sound construction confers no new power or authority upon the master, but is a legislative recognition and reservation of a portion of that, which he before possessed over his slave; affording another strong proof, that the killing of a slave, was not then regarded as felony at common law; for upon principles of the common law, the killing of a slave in the act of resistance, might be felony.
In the year 1801, Rev. ch. 585, the legislature passed another act, more guarded in its phraseology, and certain in its import; whereby the offence of murdering a slave, is expressly ousted of clergy. This act however, still left unprovided for as before, the killing of a slave under such circumstances as amounted to manslaughter. In 1817, Rev. ch. 949, the legislature passed an act supplying the omission. That act declares, that "the offence of killing a slave shall hereafter be denominated and considered homicide, and shall partake of the same degree of guilt when accompanied with the like circumstances, that homicide now does at common law." This act it is conceived embraces all the protection which the laws of North Carolina afford to a slave, against his owner or master. In regard to strangers it is otherwise. There the principles of law, may and do combine with the principles of humanity, and of policy, to afford him other and further protection. State v. Hall, 2 Hawks, 582.
From the several acts of the legislature referred to, the inference is strong, if not conclusive, that the killing of a slave was not felony in this state, until it was declared so to be by the acts of 1774 and 1791, for if it was so regarded before the act of 1774, the object of the act of 1791, could have been better accomplished by the simple repeal *Page 159 
of that of 1774; nor would there have been any necessity for the act of 1817.
If the killing of a slave was felony in this state before the acts of 1774 and 1791, how did the Court come to the conclusion in the case of theState v. Boon, that no judgment could be pronounced; and in the case of theState v. Piver, that the defendant could not be convicted of the offence of manslaughter, for killing a slave?
If the view which I have presented be correct, the authority of the master is uncontrolled, except by the act of 1817. This proposition, in reference to the slave, is, I admit, a harsh one, and it is far from being grateful to my feelings to maintain it; but I am feebly endeavouring to ascertain, from the best lights in my reach, what the law is, in a highly delicate and important matter, involving extensively the best interests of society, and must indulge a freedom of inquiry, becoming the occasion. The position contended for is, however, in strict accordance with the case of the State v. Mann.
If such be the extent of the authority and dominion of the master over the slave, the duty and submission of the latter, must be co-extensive. For if the law confers rights on the master, it will enjoin submission to those rights, as a duty on the part of the slave. It is no part of my proposition, nor was it any part of that of the Court, in the case of theState v. Mann, that the master has absolute and uncontrolled authority over the life of the slave. It is distinctly conceded by me, and as I conceive by the Court in the above case, (for the protection of the statute law is expressly adverted to,) that the life of the slave is protected against the wanton and unprovoked cruelty of the master, as well as the stranger; or against such killing, as upon principles of the common law, would amount to murder, or manslaughter.
Assuming for the present, that the deceased was the master of the slave Will, let us inquire whether the facts set forth in the special verdict, constitute murder, or manslaughter.
If it be true, that the authority and dominion of the master over the slave, except so far as to protect his life *Page 160 
from such destruction as would amount to murder, or manslaughter, it will follow that the killing under the circumstances set forth in the special verdict, will be murder. It is a well-settled principle of criminal law, that every homicide is deemed to be murder, unless circumstances are shown, which will extenuate it to manslaughter, excuse or justify it. It is not contended on the part of the prisoner, that this is a case of excusable or justifiable homicide; but it is insisted, that it is manslaughter only. Now to extenuate a homicide to manslaughter, there must be a legal provocation. It is insisted that the shooting, and subsequent pursuit and seizure, by the deceased, amounted to such provocation. I deny the position. What is sufficient or legal provocation? It must be such as is calculated to excite the passions to such a pitch, as to destroy the free exercise of reason, so that the act of killing, can be fairly ascribed to passion, and not to the malignity of the heart. I contend however, that nothing which the law recognises and tolerates as a right, can amount to such provocation. It must be what the law forbids either as an offence or civil injury. No matter how repugnant to the principles of the moral law, or the precepts of Christianity, may be a right which the municipal law recognises, yet those towards whom its exercise is permitted, must submit to it. It must be so, or the law would be inconsistent with itself; it would deny the enjoyment of a right, at the same time that it authorises its exercise. If the master's authority be what I contend it is, and the case of the State v.Mann has any foundation in law, the conduct of the deceased towards the prisoner, was in nowise forbidden by law, and could not therefore, constitute a legal provocation, to extenuate the homicide to manslaughter. One of the cases put by one of the counsel for the prisoner, affords an apt illustration of the position here contended for. He says, "If an apprentice being under a lawful correction, shall resist and slay his master, it is murder and not manslaughter, because the law cannot admit that he was provoked."
I do not insist that the slave is bound to submit to every attempt of violence on the part of the master. It has *Page 161 
already been conceded, that the life of the slave is under the protection of the law. If, therefore, the master attempt to take the life of the slave, in a wanton or cruel, unjustifiable or inexcusable manner, the slave may resist the attempt, even unto death, upon the principle of self-defence. For as the law protects the life of the slave, it will permit the use of his faculties to prevent unlawful destruction, no matter by whom assailed. If the necessity to slay the assailant, being his master, in order to protect his own life, has ceased, and he kills without such necessity, it will be murder. For if the act be committed under the influence of passion, roused by the exercise of a right recognised by law, it cannot be referred to a sufficient or legal provocation, so as to extenuate it from murder to manslaughter, any more than the act of the apprentice slaying his master while under a lawful correction.
These positions flow from the principles of law, upon which the decision in the case of the State v. Mann, are based, and are in strict conformity with that protection designed to be extended to the slave, and the authority and dominion of the master. To make this case, or any other where a slave kills his master, or owner, manslaughter, would add nothing to the security of the slave; for the idea of protection or self-preservation does not enter into the offence of manslaughter; it proceeds from passion.
But it may be supposed, that if some indulgence is not extended to the passions of the slave, an impossibility will be required of him — that to which human nature cannot submit. In judging of the capability of the slave to submit to correction, or the exercise of authority, even under circumstances of violence and indignity, we must not make ourselves the standard. If so, we should regard that privation of natural freedom, which belongs to a state of slavery, at least as a sufficient provocation to extenuate a homicide to manslaughter; for to a freeman, the idea of slavery is more intolerable than that of death. But in general, one who is born and nurtured in slavery, is contented with his condition; and instances not rare, where slavery is preferred to freedom. When under the punishment *Page 162 
of the master, we seldom discover more than the writhings of bodily pain, and passive submission. The truth is, the slave being taught to believe that he is the property of his master, and that submission to his will is commendable, feels no degradation or sentiment of indignity common to the breast of a white man, under the severest chastisement. He knows that such belongs to his lot or condition. To withhold from a slave, therefore, who has slain his master, that extenuation due to the passions of a white man, would not be too much for human nature inured to slavery, to submit to; and while it would detract nothing from the security of the slave, it would add to that of the master. The principle of self, it interest in the master, humane and moral considerations, public opinion, the punishment which the law inflicts for the felonious or malicious killing of a slave, would impose restraints for his protection, while the master would be secured against the passions of the slave.
But if our Courts of justice should assume the front rank in the humane and benevolent work of advancing the slave in the scale of moral beings, instead of leaving that task to the legislature, by declaring that, what in the case of the State v. Mann, was held to be not even an assault in law, shall, when made the pretext by a slave to kill his master, extenuate the killing to manslaughter, it behooves us to pause and reflect upon the probable consequences. If, instead of knowing that the authority of his master is unlimited, except by those restraints for the protection of his life, he is given to understand that it is abridged still further, and that for violence inflicted by the master, with any weapon calculated to produce death, be it a gun, rod, or cane, he may wreak his vengeance without incurring the punishment of death, what will be its tendency? It will increase the importance of the slave, and beget a spirit of insubordination, the most dangerous to the peace and safety of the community. Begin the humane work of advancing them in the scale of moral beings, and it may be discovered, when too late, that such policy must result in the destruction of the rest of society, or of the slave population. They would become discontented; one *Page 163 
privilege or indulgence would beget desires for another, until nothing short of absolute emancipation would satisfy. It must then be had, or an alternative the most shocking to humanity would then he resorted to.
I have supposed the deceased, who was an overseer, to stand in the relation of master to the prisoner. That is the light in which he must be considered. It is competent for the owner of the slave, to delegate that authority and dominion to another, which he himself possesses — the slave has no will in the matter. According to the understanding of the country, the employment of an overseer, is an investment by the owner, of that authority, which he possesses, with a view to the accomplishment of the object of his employment. The overseer is regarded as the master, in the absence of the owner, for all purposes of authority and obedience. In the case of the State v. Mann, it was held, that the hirer is clothed with the authority of master, for the term of hiring, in order to the enjoyment of that interest, which he has in the services of the slave. There is the same necessity for such authority in the overseer, to secure the services of the slave to the master.
— This question has been argued with great ability and zeal. It has been considered by us with all that solicitude which its grave character, and the important interests which it involves, so imperatively demanded, and it now remains for us to pronounce the result to which our deliberations have conducted us.
The crime charged is that of murder at common law. By that law, murder is described to be, "when a person of sound mind and discretion, killeth any reasonable creature in being, with malice aforethought;" and the inquiry in this case, is, whether upon the facts found, the law adjudges that the killing was committed with malice aforethought. If it so adjudge, then the prisoner was rightfully convicted of murder; if it do not so adjudge, then he was guilty of that felonious and unlawful homicide, which it terms manslaughter. This term, malice aforethought, is not restricted to the case of direct malevolence to the unfortunate *Page 164 
victim of violence, but is extended to all those cases where the fatal act is not the result of a sudden transport of passion, which may be regarded as incident to human infirmity, but is characterised by wickedness, and manifests a depraved heart, regardless of the rights of others, and fatally bent on mischief. Where there is no explanation of the motive, the law can attribute the deed only to this wicked disposition, as it will not presume the existence of what does not appear. But where the facts connected with the transaction show a motive — an immediate cause for the act done — the law assigns the deed to that motive, the effect to its immediate cause, and will not lightly admit, that it was the consequence of any preconceived purpose.
The prisoner is a slave, and, at the time of this transaction, was under subjection to the deceased, who was an overseer, employed by the master of the prisoner for superintending the management of his plantation. A complaint of some act of petulance and impropriety having been made to the deceased against the prisoner, the deceased formed a resolution of punishment or violence, the precise nature of which does not appear. From his positive reply to his wife's dissuasion; from his directing the foreman to follow with a cowhide, and from his taking a gun with him, it must be inferred that his primary intent was to inflict corporal chastisement on the prisoner, and that he also purposed, in some event which he deemed not unlikely to occur, to shoot the prisoner. Upon arriving within twenty or twenty-five feet, he called to the prisoner, who was engaged at his labour, and who immediately approached the deceased in a respectful manner, near enough to hear a communication of his purpose. The prisoner, on learning it, made off, and when distant between ten and fifteen steps, the deceased fired upon him, lodged the whole load in the prisoner's back, and inflicted a wound likely to occasion death. The prisoner fled, was headed by the deceased, turned to fly in an opposite direction, was overtaken by the deceased, and by several negroes, who had been ordered in pursuit, struggled to avoid the arrest, used his knife to cut himself free, and in the struggle inflicted with the knife two wounds, one on the thigh, the other on *Page 165 
the arm, the latter of which proved mortal. The whole transaction from the time of the shooting until the fatal struggle, did not last more than six or eight minutes.
Had this unfortunate affair occurred between two freemen, whatever might have been their relative condition, the homicide could not have been more than manslaughter. Take the case of a master and apprentice, where the latter flies to avoid correction, which the master has a right to inflict. If the master were to shoot at him, engage in hot pursuit, overtake him, and in the immediate struggle, the master was killed; the deed could not be attributed to downright wickedness, but to passion suddenly and violently excited, to that "fervor brevis" which leaves not to the mind the calm exercise of its facilities, and which the law must regard, not indeed as excusing the act, but as extenuating the degree of guilt. If an officer, armed with the authority of the law to arrest one who has committed a misdemeanor, were, upon the culprit's flying to avoid an arrest, to use his authority with the same circumstances of outrage, and the like result had happened, the crime would not be murder, but manslaughter only. (1 Hawkins, ch. 13, sect. 63, 64, 65. Foster, ch. 2, sect. 2. 1 East, Homicide, sect. 70-86.) It must be admitted, however, that the relation which exists between the owner or temporary master, and his slave, is in many respects strikingly dissimilar from that which the law recognises between a master and his apprentice, or between any two freemen of whom one may have the right to arrest, imprison, or even chastise the other. Unconditional submission is the general duty of the slave; unlimited power, is in general, the legal right of the master. Unquestionably there are exceptions to this rule. It is certain that the master has not the right to slay his slave, and I hold it to be equally certain that the slave has a right to defend himself against the unlawful attempt of his master to deprive him of life. There may be other exceptions, but in a matter so full of difficulties, where reason and humanity plead with almost irresistible force on one side, and a necessary policy, rigorous indeed, but inseparable from slavery, urges on the other, I fear to err, should I undertake to define them. The general rule *Page 166 
is, that which has been before declared. There is no legal limitation to the master's power of punishment, except that it shall not reach the life of his offending slave. It is for the legislature to remove this reproach from amongst us, if, consistently with the public safety, it can be removed. We must administer the law, such as it is confided to our keeping.
It is not necessary on this occasion to determine, (and we would avoid all unnecessary inquiries,) whether the power of an overseer is as unrestricted as that of the master. All of us agree, that in the case before us, he had an unquestionable right to judge of the offence which had been committed by the prisoner, and to inflict such chastisement, as, according to the usages of discipline, and his sound discretion, was proper to enforce subordination. Upon the special verdict, we see no fact from which it can legally be inferred, that his primary purpose was to do more. He was acting then, within the limits of his rightful authority, when he summoned the prisoner to him, and announced his resolution; and the act of the prisoner in attempting to evade punishment was a breach of duty. This act, however, was not resistance nor rebellion, and it certainly afforded no justification nor excuse for the barbarous act which followed. Had the prisoner died of the wound which the overseer inflicted, the latter would have been guilty of manslaughter at least, — probably of murder. The offence of shrinking from menaced punishment, called for no such desperate corrective; the deed was the more strongly impressed with the character of cruelty, as it was preceded by no warning to the fugitive, and it was too probable that it had been deliberately contemplated and eventually resolved on, before the attempt to escape. Had the prisoner, previously to the shooting, resisted an arrest, and, in the course of the struggle, inflicted the mortal wound on the deceased, there is no doubt that his crime in legal contemplation, must have been murder. Nothing had then occurred which could have excited in any but a cruel and wicked heart, in a heart fatally resolved on illegal resistance, at whatever risk of death or great bodily harm to others, a passion so violent and so destructive in *Page 167 
its consequences. It is not to passion, as such, that the law is benignant, but to passion springing from human infirmity. But after the gun was fired, all must see that a vast change was effected in the situation of the prisoner; and that new and strong impulses to action must have been impressed upon his mind. Suffering under the torture of a wound likely to terminate in death, and inflicted by a person, having indeed authority over him, but wielding power with the extravagance and madness of fury; chased in hot pursuit; baited and hemmed in like a crippled beast of prey that cannot run far; it because instinct, almost uncontrollable instinct to fly; it was human infirmity to struggle; it was terror or resentment, the strongest of human passions, or both combined, which gave to the struggle its fatal result; and this terror, this resentment, could not but have been excited in any one who had the ordinary feelings and frailties of human nature. But will the law permit human infirmity to extenuate a homicide from murder to manslaughter, in any case where the slayer is a slave, and the slain is the representative of his master? Will it allow in such a caseany passions, however common to human beings, and however strongly provoked into action, to repel the allegation of malice?
In considering these questions, it may not be unimportant to remember, that passion, however excited, is not set up as a legal defence, or excuse for a criminal act. To kill a man in a sudden fury is as much a crime, as to slay him because of personal malevolence, or of a general hostility to the human family. No one has a right to yield to passion the dominion over judgment and conscience, and an illegal act of violence becomes in no respect lawful, by being committed during a voluntary overthrow of reason. But the law in its salutary chastisement of vicious and imperfect beings, endeavours to temper rigour with benignity, and visits with greater or less severity a violation of its injunctions, accordingly as it traces such violation to more or less atrocious motives, indicating more or less of human depravity or human frailty. The prisoner's traverse extends to the whole charge contained in the indictment, and his right to impel the averment of malice, *Page 168 
is but a right to be tried, before he is convicted. If the entire charge be sustained, he is then guilty, as charged; if the allegation of malice be not sustained, he is guilty only of the residue of the matter charged.
The law, which holds, that passion springing from ordinary frailty, is not malice, has also undertaken to designate what provocation or excitement, may or may not rouse passions in minds infirm, although not malignant. This undertaking to give greater precision to its rules, so far as it has been successful, has been effected by the labours of wise and good men, continued through a long series of ages, and is evidenced by adjudications in the numerous, or rather innumerable cases of homicide which the annals of human crime present. The secondary rules thus ascertained and authoritatively enforced, are as obligatory upon the conscience of Judges as the primary rule itself. They explain the primary rule, limit its extent, show its application, and restrain the exercise of a vague discretion. Some causes of passionate excitement are termed "legal
provocations." while others have been declared not to be "legal
provocations." This term must not be understood to mean that a man has a legal right to be provoked, but only that the law regards certain offensive acts as provocations, while it refuses to consider others as such. The latter, though provocations in common parlance, are not provocations in a legal sense, and therefore not comprehended in the phrase of "legal provocations." When a case of homicide happens in which the fact of provocation occurs, and the legal character of that fact has been settled by precedents, the judicial duty is comparatively plain. But where the legal character of the fact has never before been settled, it then becomes one of vast responsibility, and often of no little difficulty. Theprinciple to be extracted from former adjudications must then be diligently sought for, and prudently applied. In most of the cases where passion has been viewed as mitigated by infirmity, it has been called into action by injuries which the law punishes as crimes against the community. A man is assaulted, and in a transport of passion kills the assailant; or an individual who has committed an *Page 169 
offence short of felony, is arrested or attempted to be arrested by an officer without a lawful warrant, or with unlawful violence, and in the struggle kills the officer, the injuries of the deceased, which the law regards as provocations, are misdemeanors, and as such the subjects of criminal prosecution. Is it the criterion which discriminates ordinary from malignant passion, that the former is excited by offensive conduct amounting to a breach of the public law? If it be, then can the prisoner's guilt be alleviated into manslaughter? The overseer had indeed inflicted a wound which might have proved mortal, but it did not terminate in death. Had the overseer lived he could not have been indicted for the deed; for however criminal his intent, the criminal act was not consummated. If he could not have been indicted for the act, can this act be termed a legal provocation?
On deliberate reflection, the Court is satisfied that this is not the criterion. The law does not regard certain acts as provocations because they are indictable, but in many cases it makes certain acts indictable because they are provocations, and may occasion the shedding of human blood. There are legal provocations for which an indictment will not lie. There are indictable injuries which are not legal provocations. A libel is not only a civil injury, but a public offence, yet the law will not consider it a provocation extenuating the slaying of the libeller into manslaughter, although the deed may have been committed in the first gust of passion. Adultery is not an indictable offence, yet of all the provocations which can excite man to madness, the law recognises it as the highest and the strongest.
If the law were, from a policy well or ill conceived, to make it an indictable offence to call a man a liar, the rule would yet remain "that words of reproach, how grievous soever, are not a provocation sufficient to free the party killing from the guilt of murder." If, on the contrary, it should declare no assaults indictable, which did not cause actual bodily harm, to spit in another's face would remain as it is, a provocation. Consistently with good sense, can this be the criterion? The circumstance that adequate *Page 170 
punishment will be inflicted by law, ought rather to make the sufferer more patient under wrong, while the belief or the knowledge that human laws afford no redress, is calculated rather to exasperate resentment, to augment terror, and to perplex and distract reason. The application of such a criterion to cases like the present, would lead to extraordinary results. The inquiry is, with what disposition was the fatal act done. That disposition must depend on the then exciting causes. Events subsequently happening and which it was not given to man's sagacity to foresee,certainly did not, and could not operate either to increase or lessen excitement. Yet accordingly as this unknown contingency shall eventuate, the law, proudly styled the perfection of reason — determines on the disposition with which a preceding act was done! If the wound, apparently mortal, proves mortal, and the negro dies, then he killed the overseer in a moment of human infirmity; for the act of the deceased which led to it was an indictable offence. But if it please the Author and Preserver of life to raise him from the bed of death, then his act was not prompted by passion, but instigated by malice. If he lives, he is a murderer, but if he die he was not. Often the law, in its mercy, withholds from a criminal act, which, because of some happy casualty wholly independent of the will of the wrong-doer, has not been completed, the full rigour of its punishment; but if, in our code of criminal law, there be any case in which an unlawful intent is by a subsequent casualty aggravated into a purpose of deeper atrocity, it has escaped our observation.
What, then, is the true principle which characterises the various adjudications on the subject of provocation and excited passion? I am compelled to say, that no other is to be found, but what is contained in the primary rule itself, applied from time to time by wisdom and experience, to cases as they occurred, until in a vast majority of the cases that can occur, the existing tribunals of justice find a safe guide in the undisputed decisions of their predecessors. Where they have not this guide, they are bound to act, as those acted, who had no precedent to direct them. *Page 171 
We have no adjudged case that determines this question, or presents us with a precise rule by which to determine it. The case of the State v. Mann, 2 Dev. Rep. 263, does not bear upon the question. It decides, indeed, that the master or temporary owner is not indictable for a cruel and unreasonable battery of his slave. None could feel more strongly the harshness of the proposition, than those who found themselves obliged to declare it a proposition of law. Not that they for one moment admitted that cruelty was rightful, but they found no law by which to ascertain what was cruelty in the master, so as to render it punishable as a public offence. Resistance, therefore, on the part of the slave to the battery of his master cannot be legally excused, although such battery may be unreasonable; but the degree of its criminality that decision cannot aid us to ascertain. The case of the State v. Mann, at the same time pronounced, what was indeed beyond question, that the law protects the life of the slave against the violence of his master, and that the homicide of a slave, like that of a freeman, is murder or manslaughter. An attempt to take a slave's life is then an attempt to commit a grievous crime, and may rightfully be resisted. But what emotions of terror or resentment may, without the imputation of fiendlike malignity, be excited in a poor slave by cruelty from his master that does not immediately menace death, that case neither determines, nor professes to determine. In the absence, then, of all precedents directly in point or strikingly analogous, the question recurs; if the passions of the slave be excited into unlawful violence, by the inhumanity of his master or temporary owner, or one clothed with the master's authority, is it a conclusion of law, that such passions must spring from diabolical malice? Unless I see my way clear as a sunbeam, I cannot believe that this is the law of a civilized people and of a Christian land. I will not presume an arbitrary and inflexible rule so sanguinary in its character, and so repugnant to the spirit of those holy statutes which "rejoice the heart, enlighten the eyes, and are true and righteous altogether." If the legislature should ever prescribe such a law — a supposition which *Page 172 
can scarcely be made without disrespect, it will be for those who then sit in the judgment seat to administer it. But the appeal here is to the common law, which declares passion not transcending all reasonable limits, to be distinct from malice. The prisoner is a human being, degraded indeed by slavery, but yet having "organs, dimensions, senses, affections, passions," like our own. The unfortunate man slain was for the time, indeed, his master, yet this dominion was not like that of a sovereign who can do no wrong. Express malice is not found by the jury. From the facts, I am satisfied as a man, that in truth malice did not exist, and I see no law which compels me as a judge to infer malice contrary to the truth. Unless there be malice, express or implied, the slaying is a felonious homicide, but it is not murder.