Ruffin, Judge.
 

 A Judge cannot hut lament, when such cases as the present are brought into judgment. It is impossible that the reasons on which .they go can be appreciated, but where institutions similar to our own, exist and are thoroughly understood. The struggle, too, in the Judge’s own breast between the feelings of the man, and the duty of the magistrate is a severe one, presenting strong temptation to put aside sucli questions, if it be possible. It is useless however, to complain of things inherent in our political state. And it is criminal in a Court to avoid any responsibility which the law's impose. With whatever reluctance therefore it is done, the Court is compelled to express an opinion upon the extent of the dominion of the master over the slave in North-Carolina.
 

 The indictment charges a-battery on
 
 Lydiá,
 
 a slave of
 
 Elizabeth Jones.
 
 Upon the face of the indictment, the case is the same as the
 
 State
 
 v.
 
 Hall.
 
 (2
 
 Hawks
 
 582.)—No fault is found with the rule then adopted,* nor would he, if it were now open. But it is not open j for the question, as it relates to a battery on a slave by a stranger, is considered as settled by that case. But the evidence makes this 'a different case. Here the slave had been
 
 hired
 
 by the Defendant, and was in bis possession ; and the battery was committed during the period of hiring. With the liabilities of the hirer to the general owner, for an injury permanently impairing the value of the slavo, no rule now laid down is intended to interfere. That is left upon the general doctrine of bailment. The enquiry here is, whether a cruel and unreasonable battery on a slave, by the hirer, is indictable. The Judge below instructed the Jury, that it is. He seems to have put it on the ground, that the Defendant had but a spe
 
 *265
 
 cial property. Our laws uniformly treat the master or other person having the possession and command of the slave, as entitled to the same extent of authority. The object is the same — the sen ices of the slave; and the same powers must be confided. In'a criminal proceeding, and indeed in reference to all other persons but the general owner, the hirer and possessor of a slave, in relation to both rights and duties, is, for the time being, the owner. This opinion would, perhaps dispose of this particular case ; because the indictment, which charges a battery upon the slave of
 
 Elizabeth Jones,
 
 is not supported by proof of a battery upon Defendant’s own slave; since different justifications may be applicable to the two cases. But upon the general question, whether the owner is answerable
 
 mminaliter,
 
 for a battery upon his own slave, or other exercise of authority or force, not forbidden by statute, the Court entertains but little doubt. — . That he is so liable, has never yet been decided; nor, as far as is known, been hitherto contended. There have been no prosecutions of the sort. The established habits and uniform practice of the country in this res* pect, is the best evidence of the portion of power, deemed by the whole community, requisite to the preservation ©f the master’s dominion. If we thought differently, we could not set our notions in array against the judgment Of every body else, and say that this, or that authority, may be safely lopped off. This has indeed been assimilated at the bar to the other domestic relations ; and arguments drawn from the well established principles, which confer and restrain the authority of the parent over the child, the tutor over the pupil, the master over the apprentice, have been pressed on us. The Court does not recognise their application. There is no likeness between the cases. They are in opposition to each other, and there is an impassable gulf between them. — „ The difference is that which exists between freedom and slavery — and a greater cannot he imagined In throne,
 
 *266
 
 the end in view is the happiness of the youth, born to equal rights with that governor, on whom the duty de-vojves 0f training the young to usefulness, in a station which he is afterwards to assume among freemen. To such an end, and with such a subject, moral and intellectual instruction seem the natural means ; and for the most part, they are found to suffice. Moderate force is superadded, only to make the others effectual. If that fail, it is better to leave the party to his own headstrong passions, and the ultimate correction of the law, than
 
 to
 
 allow it to be immoderately inflicted by a private person. With slavery it is far otherwise. The end is
 
 the
 
 profit of the master, his security and the public safety; the subject, one doomed in his own person, and his posterity, to live without knowledge, and without the capacity to make any thing Ids own, and to toil that another may reap the fruits. What moral considerations shall be addressed to such a being, to convince him what, it is impossible but that the most stupid must feel and know can never be true — that he is thus to labour upon a principle of natural duty, or for the sake of his own personal happiness, such services can only be expected from one who has no will of his own ; who surrenders his will in implicit obedience to that of another. Such obedience is the consequence only of uncontrolled authority over the body. There is nothing else which can operate to produce the effect. The power of the master must be absolute, to render the submission of the slave perfect. I most freely confess my sense of the harshness of this proposition, I feel it as deeply as any man can. And as a principle of moral right, every person in his retirement must repudiate it. But in the actual condition of things, it must be so. There is no remedy. This discipline belongs to the state of slavery. They cannot be disunited, without abrogating at once the rights of the master, and absolving the slave from his subjection. It constitutes the curse of slavery to, both
 
 *267
 
 the bond ami free portions of our population. But it is inherent in the relation of master and slave.
 

 That there may be particular instances of cruelty and deliberate barbarity, where, in conscience the law might properly interfere, is most probable. The difficulty is . to determine, where
 
 a Court
 
 may properly begin. Merely in the abstract it may well be asked, which power of the master accords with right. The answer will probably sweep away all of them. But we cannot look at the matter in that light. The truth is, that we are forbidden to enter upon a train of general reasoning on the subject. We cannot allow the right of the master to be brought into discussion in the Courts of Justice. The slave, to remain a slave, must be made sensible, that there is no appeal from his master; that his power is in no instance, usurped j but is conferred by the laws of man at least, if not by the law of God. The danger would be great indeed, if the tribunals of justice should be called on to graduate the punishment appropriate to every temper, and every dereliction of menial duty. No man can anticipate the many and aggravated provocations of the master, which the slave would be constantly stimulated by bis own passions, or the instigation of others to give; or the consequent wrath of tiie master, prompting him to bloody vengeance, upon the turbulent traitor — a vengeance generally practised with impunity, by reason of its privacy. The Court therefore disclaims
 
 the
 
 power of changing the relation, in which these parts of our people stand to each other.
 

 We are happy to see, that there is daily less and less occasion for the interposition of the Courts. The protection already afforded by several statutes, that all-powerful motive, the private interest of the owner, the benevolences towards each other, seated in the hearts of those who have been born and bred together, the frowns and deep execrations of the community upon Ihe barbarian, who is guilty of excessive and brutal cruelty to his
 
 *268
 
 unprotected slave, all combined, have produced a mild nesg 0f treatment, and attention to the comforts of the , „ , ... unfortunate class of slaves, greatly mitigating the rigors 0f servitude, and ameliorating the condition of the slaves. The same causes are operating, and will continue to operate with increased action, until the disparity in numbers between the whites and blacks, shall have rendered the latter in no degree dangerous to the former, when the police now existing may be further relaxed. This result, greatly tobe desired, may be much more rationally expected from the events above alluded to, and now in progress, than from any rash expositions of abstract irnths, by a Judiciary tainted with a false and fanatical philanthropy, seeking to redress an acknowledged evil, by means still more wicked and appalling than ever, that evil.
 

 I repeat, that I would gladly have avoided this un - grateful question. But being brought to it, the Court is compelled to déclare, that while slavery exists amongst us in its present state, or until it shall seem fit to the Legislature to interpose express enactments to the contrary, it will be the imperative duty of the Judges to re-cognise the full dominion of the owner over the slave, except where the exercise of it is forbidden by statute.. And this we do upon the ground, that this dominion is essential to the value of slaves as property, to the security of the master, and the public tranquillity, greatly dependent upon their subordination; arid in fine, as most effectually securing the general protection and comfort of the slaves themselves.
 

 Per Curiam. — Let the judgment below be reversed, and judgment entered for the Defendant.