RUFFIN, C. J., dissented.
This was an indictment for murder in the words and figures following, to wit: *Page 270 
STATE OF NORTH CAROLINA — Martin County. Superior Court of Law, Fall Term, 1848.
The jurors for the State, upon their oath, present, that Caesar, a slave, the property of John Latham and Thomas Latham, not having the fear of God before his eyes, but being moved and seduced by the instigation of the devil, on the fourteenth day of August, A. D. eighteen hundred and forty-eight, with force and arms, at and in the county of Martin aforesaid, in and upon one Kenneth Mizell, in the peace of God and the State then and there being, feloniously, willfully and of his malice aforethought, did make an assault, and that the said Caesar, with a certain large stick, which by the said Caesar in both his hands then and there had and held, him the said Kenneth (392) Mizell, then and there feloniously, willfully and of his malice aforethought, did strike and beat, giving to him, the said Kenneth Mizell, then and there, by striking and beating him as aforesaid, with the stick aforesaid, in and upon the left jaw and the left side of the neck of him, the said Kenneth Mizell, one mortal bruise, of the breadth of two inches and of the length of six inches, of which said mortal bruise the said Kenneth Mizell from the said fourteenth day of August in the year aforesaid, until the fifteenth day of the same month in the year aforesaid, at and in the county aforesaid, did languish and, languishing, did live; on which said fifteenth day of August, in the year aforesaid, the said Kenneth Mizell, in the county aforesaid, died; and so the jurors aforesaid, upon their oath aforesaid, do say that the said Caesar the said Kenneth Mizell, in the manner and form aforesaid, feloniously, willfully and of his malice aforethought, did kill and murder, contrary to the peace and dignity of the State.
On which indictment the prisoner, being arraigned, pleaded not guilty.
The prisoner being put on his trial, the State first examined one Brickhouse, who stated that he went, in company with the deceased, to Jameston, in the county of Martin, in the afternoon of 14 August, 1848; that the deceased and he (the witness) drank spirits in the town of Jameston, until they were both intoxicated; that they went to the house of Mr. Cahoon about dark for the purpose of staving all night; that he (the witness) and the deceased went to bed together, and, after sleeping some short time, he was awoke by the deceased, who proposed that they should get up and walk out; that they did so, and crossed an old field and went into the town of Jameston; they had a bottle of spirits with them, and each took a drink *Page 271 
while crossing the old field; that near a storehouse in Jameston they found two negro men lying on the ground; that the witness was not acquainted with either of them, but had since learned that they were the prisoner and a man (393) named Dick; the witness informed the prisoner and Dick that he and the deceased were patrollers, and he (the witness) took up a piece of board and gave the prisoner and Dick each two or three slight blows; that he (the witness) then entered into a conversation with the prisoner and Dick, and, while conversing with them, a third negro came up, who, he has since understood, is named Charles; that he (the witness) asked Charles if he knew they were patrollers, and took hold of Charles and ordered Dick to go and get a whip for him to whip Charles with; Dick went off a few steps and stopped; witness let Charles go and took hold of Dick; witness then received a violent blow on his head, which made a wound about an inch in length, and stunned him; when he recovered he saw the deceased lying on the ground at full length and the negroes all gone; witness called the deceased, but received no answer; witness then went to the house of Cahoon to get a gun, but failing to do so, returned where he had left the deceased, and found the deceased some twenty yards from where he left him; deceased was lying on the ground; the deceased got up and took his (witness') arm and witness conducted deceased to the house of Cahoon; deceased asked for some water, which witness procured for him, and he and the deceased went to bed together; after they were in bed the deceased asked witness if he would go with him on Thursday night after the negroes, and further remarked that he could not talk much longer. Witness further stated that, being considerably intoxicated, he fell asleep and was awoke about 2 or 3 o'clock in the morning by Mr. Cahoon. The deceased was dying, and blood and froth running from his mouth and nose on the pillow where he lay. Deceased died in a few minutes after witness awoke.
The slave Dick was next examined on the part of the (394) State. Dick stated that he and the prisoner were lying on the ground near a storehouse about 11 o'clock at night; that two white men, strangers to him, came to the place where he and the prisoner were lying; that one of them, who, he has since learned, was Mr. Brickhouse, said they were patrollers, and Brickhouse took a piece of board and gave the witness and the prisoner each two or three slight blows, which did not hurt the witness, and the witness thought it was done in sport by Brickhouse. Brickhouse then asked the witness if he could not get some girls for them, and further remarked that he had money *Page 272 
a plenty; witness declined doing so. About that time Charles came up; Brickhouse asked Charles if he knew they were patrollers, and took hold of Charles and ordered witness to go and get a whip to whip Charles with; witness moved off a few steps and stopped; Brickhouse then let go Charles and took hold of witness, and the deceased also took hold of the hand of witness; Brickhouse then began to beat the witness with his fist and struck several blows on the head and in the side of witness, which hurt him, and he begged Brickhouse to quit. Witness further stated that while Brickhouse was beating him with his fist and the deceased holding his hand, the prisoner went to the fence and got a rail and struck in among them, and they all came down together, and he got up and ran off.
Charles was next examined by the State. Charles stated that he heard a conversation and went to the place, where he found two white men and Caesar and Dick engaged in conversation; Brickhouse asked him (the witness) if he knew they were patrollers, and took hold of him (the witness) and told Dick to go and get a whip; Dick moved off a few steps and stopped; Brickhouse let witness go and took hold of Dick and began to beat him with his fist, and the deceased also took hold of (395) Dick; the prisoner remarked to witness that he could not stand that, and ran to the fence and got a rail, and with the rail in both hands struck Brickhouse on the head; the rail broke in two pieces, leaving a piece of the rail three or four feet long in the hands of the prisoner; the prisoner then struck Mizell, the deceased, with the piece in his hands and felled him to the ground at full length; the prisoner then ran off and Brickhouse pursued him; witness also ran off, leaving the deceased lying at full length on the ground. This witness was then examined as to the size and quality of the rail used by the prisoner. He stated that it was a fence rail of the usual length, was fit for fencing, and was part of a fence when taken by the prisoner, and was about the size of a piece of timber in the courthouse, pointed out by the witness, which piece of timber was about four inches wide by two and a half inches thick. The witness further stated that the rail aforesaid was of sap timber and tolerably rotten, and that it had rained the day before.
Whitmell, a slave, was next examined by the State. He stated that on the night of the homicide the prisoner came to his house in Jameston and asked him (the witness) how he was. Witness replied he was very well. Witness then asked the prisoner how he was. The prisoner replied, "Bad enough," and went on to say that he had knocked down one white man and crippled *Page 273 
another; and further said the white men were beating Dick; that he took a rail and knocked them down, one for dead; that the other white man called the one he had knocked down, but he did not answer, and he (the prisoner) did not know whether he was dead or not; the prisoner further stated that the white men gave them two or three licks round and walked off, and he (the prisoner) and Dick laughed; the white men came back and fell to beating Dick; that he (the prisoner) asked Charles if he could stand that; Charles said nothing; prisoner said to Charles, with an oath, that he could not stand it; he got (396) a rail and struck them, and left one of them for dead. The prisoner was a man of ordinary size, and it was in proof that he was employed in getting timber. It was also in proof that he was obedient to white persons, so far as the witness knew or had heard.
The Attorney-General insisted that, upon this evidence, it was a case of murder.
The prisoner's counsel contended that whilst an ordinary assault and battery by a white man on a slave would not be sufficient to extenuate the crime from murder to manslaughter, yet this was a case in which we were obliged to resort to the primary rule, which pronounces on the character of provocations, and that the application of this principle was left to the intelligence and conscience of the jury; that the circumstances of this case, the time, the manner, the drunken situation of the white men, their conduct on that occasion, being utter strangers to the negroes and the negroes to them, were naturally calculated to provoke a well-disposed slave into a violent passion, and, therefore, the crime was extenuated to manslaughter.
The prisoner's counsel further contended that, if the jury believed the deceased and Brickhouse, having whipped the prisoner, then violently assaulted Dick, without provocation or justification, and was in the act of severely beating him (Dick begging), so as naturally to provoke the anger of the prisoner, being a well-disposed negro, and, under the excitement of passion thus produced, the prisoner gave the deceased a blow which produced death, it was only manslaughter; that if the jury believed the deceased and Brickhouse, without authority or justification, having whipped the prisoner, then were in the act of severely beating Dick, the comrade of the prisoner (Dick then begging), and the prisoner, with the intent of releasing Dick from further violence, struck the deceased, it was only manslaughter; that if the jury believed the deceased and (397) Brickhouse, without authority or justification, whipped the prisoner, as stated by the witness, and then the deceased and *Page 274 
Brickhouse, without authority, provocation or justification, were violently beating Dick, the comrade of the prisoner (Dick then begging), and the prisoner, under the excitement of passion thus produced and with an intent only to relieve his comrade, Dick, from further violence, struck the deceased, it was only manslaughter; that if the jury believed the prisoner struck with the intent only of preventing a felony upon Dick by Brickhouse and the deceased, it was only manslaughter; that if the jury believed the prisoner struck while smarting under the influence of passion caused by the infliction of blows given him by Brickhouse or Mizell, under the circumstances it was only manslaughter. The prisoner's counsel further contended that from the evidence in this case the weapon used was not a deadly one, and that the jury were to decide that question, and argued to the jury that at least it was doubtful whether the weapon was deadly or not.
The court charged the jury that if the evidence submitted to them satisfied their minds beyond a reasonable doubt that the prisoner at the bar slew the deceased with a fence rail or a part of a fence rail, under the circumstances detailed by the witnesses, it was a case of murder.
If the witnesses had given a correct description of the rail or piece of rail with which the prisoner inflicted the blow on the deceased, it was an instrument, in the hands of a stout man, calculated to produce death or great bodily harm, and was, therefore, in law, a deadly weapon. The court further charged the jury that if the evidence of the witnesses Dick and Charles were true as to what took place preceding the blow inflicted by the prisoner on the deceased, it would not amount to legal provocation so as to extenuate the killing from murder to (398) manslaughter — the prisoner being a slave and the deceased a free white man. The blows inflicted by Brickhouse on the prisoner, as detailed by the witness Dick, and the blows subsequently inflicted on Dick by Brickhouse, were, taking the evidence to be true, nothing more than ordinary assaults and batteries; and an ordinary assault and battery, inflicted by a free white man on a slave, would not amount to such legal provocation as would extenuate the killing of a free white man by the slave from murder to manslaughter, however worthless and degraded the white man might be.
The jury, under the charge of the court, found the prisoner guilty in manner and form as charged in the bill of indictment. After sentence of death, the prisoner appealed to the Supreme Court. *Page 275 
The prisoner, a slave, is convicted of murder in killing a white man. The case presents the question whether the rules of law by which manslaughter is distinguished from murder, as between white men, are applicable when the party killing is a slave. If not, then to what extent is a difference to be made?
The general question is now presented directly for the first time. In S.v. Will, 18 N.C. 121, the person killed was the overseer, who stood in the relation of master. In S. v. Jarrott, 23 N.C. 86, the general question was discussed, but the decision did not turn upon it.
These being the only two cases in this Court where it was necessary to discuss the question, while it renders our duty the more difficult, cannot fail to strike every mind as a convincing proof of the due subordination and good conduct of our slave population, and to suggest that, if any departure from the known and ordinary rules of the law of homicide is (399) to be made, it is called for to a very limited extent.
It is clear that the killing of the deceased is neither a greater nor less offense than would have been the killing of the witness Brickhouse. He was the most forward and officious actor, but the deceased had identified himself with him. They set out upon a common purpose. When a false word was told, in saying "they were patrollers," the deceased acquiesced by silence; when the slight blows were given with the board, the deceased gave countenance to it; when Brickhouse seized Dick and began to beat him, the deceased caught hold of his hands and held him while his coadjutor beat him.
To present the general question by itself, and prevent confusion, it will be well to ascertain what would have been the offense if all the parties had been white men. Two friends are quietly talking together at night; two strangers come up; one strikes each of the friends several blows with a board: the blows are slight, but calculated to irritate; a third friend comes up; one of the strangers seizes him, and orders one of the former to go and get a whip that he might whip him. Upon his refusing thus to become an aider in their unlawful act, the two strangers set upon him; one holds his hands while the other beats him with his fist upon the head and breast, he not venturing to make resistance and begging for mercy; his friend, yielding to a burst of generous indignation, exclaims, "I can't stand this," takes up a fence rail, knocks one down, and then *Page 276 
knocks the other down, and without a repetition of the blow the three friends make their escape. The blow given to one proves fatal. Is not the bare statement sufficient? Does it require argument or a reference to adjudged cases to show that this is not a case of murder? or "of a black," diabolical heart, (400) regardless of social duty and fatally bent on mischief? It is clearly a case of manslaughter in its most mitigated form. The provocation was grievous. The blow was inflicted with the first thing that could be laid hold of; it was not repeated, and must be attributed, not to malice, but to a generous impulse, excited by witnessing injury done to a friend. The adjudged cases fully sustain this conclusion. In 12 Coke, 87, "two are playing at bowls; they quarrel and engage in a fight; a friend of one, standing by, seizes a bowl and strikes a blow, whereof the man dies. This is manslaughter, because of thepassion which is excited when one sees his friend assaulted."
This is the leading case; it is referred to and approved by all the subsequent authorities. King v. Huygot, 1 Kel., 59; 1 Russ. on Crimes, 500; 1 East. P. C., 328, 340.
As this would have been a case of manslaughter, if the parties had been white men, are the same rules applicable, the party killing being a slave? The lawmaking power has not expressed its will, but has left the law to be declared by the "courts, as it may be deduced from the primary principles of the doctrine of homicide." The task is no easy one, yet it is the duty of the court to ascertain and declare what the law is.
I think the same rules are not applicable; for, from the nature of the institution of slavery, a provocation which, given by one white man to another, would excite the passions and "dethrone reason for a time," would not and ought not to produce this effect when given by a white man to a slave. Hence, although if a white man, receiving a slight blow, kills with a deadly weapon, it is but manslaughter; if a slave, for such a blow, should kill a white man, it would be murder; for, accustomed as he is to constant humiliation, it would not be calculated to excite to such a degree as to "dethrone reason," and must be ascribed to a "wicked heart, regardless of social duty."
(401) That such is the law is not only to be deduced, as above, from primary principles, but is a necessary consequence of the doctrine laid down in S. v. Tackett, 8 N.C. 217. "Words of reproach, used by a slave to a white man, may amount to a legal provocation, and extenuate a killing from murder to manslaughter."
The reason of this decision is that from our habits of association and modes of feeling, insolent words from a slave are *Page 277 
as apt to provoke passion as blows from a white man. The same reasoning by which it is held that the ordinary rules are not applicable to the case of a white man who kills a slave, leads to the conclusion that they are not applicable to the case of a slave who kills a white man.
The announcement of this proposition, now directly made for the first time, may have somewhat the appearance of a law madeafter the fact. It is, however, not a new law, but merely a new application of a well-settled principle of the common law. The analogy holds in the other relations of life — parent and child, tutor and pupil, master and apprentice, master and slave. A blow given to the child, pupil, apprentice or slave is less apt to excite passion than when the parties are two white men "free and equal"; hence, a blow given to persons filling these relations is not, under ordinary circumstances, a legal provocation. So, a blow given by a white man to a slave is not, under ordinary circumstances, a legal provocation, because it is less apt to excite passion than between equals. The analogy fails only in this: in the cases above put, the law allows of the infliction ofblows. A master is not indictable for a battery upon his slave; a parent, tutor, master of an apprentice is not indictable, except there be an excess of force; whereas the law does not allow awhite man to inflict blows upon a slave who is not his property;
he is liable to indictment for so doing. In other words, in this last case, the blow is not a legal provocation, although the party giving it is liable to indictment; while in the (402) other cases, whenever the blow subjects one party to an indictment it is a legal provocation for the other party. This is a departure from the legal analogy, to the prejudice of the slave. It is supposed a regard to due subordination makes it necessary, but the application of the new principle by which this departure is justified should, I think, be made with great caution, because it adds to the list of constructive murders, or murders by "malice implied."
Assuming that there is a difference, to what extent is the difference to be carried? In prosecuting this inquiry, it should be borne in mind that the reason of the difference is that a blow inflicted upon a white man carries with it a feeling of degradation, as well as bodily pain and a sense of injustice, all or either of which are calculated to excite passion; whereas a blow inflicted upon a slave is not attended with any feeling of degradation, by reason of his lowly condition, and is only calculated to excite passion from bodily pain and a sense of wrong; for, in the language of Chief Justice Taylor, in S. v. Hale, 9 N.C. 582, "the instinct of a slave may be, and generally is, turned *Page 278 
into subserviency to his master's will, and from him he receives chastisement, whether it be merited or not, with perfect submission, for he knows the extent of the dominion assumed over him, and the law ratifies the claim. But when the same authority is wantonly usurped by a stranger, nature is disposed to assert her rights, and prompt the slave to resistance."
We have seen that the general rule is that whenever force is used upon the person of another, under circumstances amounting to an indictable offense, such force is a legal provocation; otherwise it is not.
By this rule S. v. Will, 18 N.C. 121, would have been a case of murder; for it was settled in S. v. Mann, 13 N.C. 263, that a master is not indictable for a battery upon his own (403) slave, however severe or unreasonable. But Will was held guilty of manslaughter only, the court feeling itself constrained to make some allowance for the feelings of nature. By this rule, if a slave who has been guilty of insolence receives a blow from a white man, it is a legal provocation; for the white man has committed an indictable offense. S. v. Hale, 9 N.C. 582. This case would be as strong an authority to show that the case above put was but manslaughter, except for reasons of policy and the necessity of keeping up due subordination, asS. v. Mann, supra, was to show that S. v. Will was a case of murder, except for an allowance for the feelings of nature.
In the case above put, a blow is supposed, unaccompanied by bodily pain or unusual circumstances of oppression, the only incentive to passion being a sense of degradation, which a slave is not allowed to feel. When bodily pain or unusual circumstances of oppression occur, one or both is sufficient to account for passion, putting a sense of degradation out of the question, and there would be legal provocation.
I think it clearly deducible from S. v. Hale, supra, and analogies of the common law, that if a white man wantonly inflicts upon a slave, over whom he has no authority, a severe blow or repeated blows under unusual circumstances, and the slave at the instant strikes and kills, without evincing, by the means used, great wickedness or cruelty, he is only guilty of manslaughter, giving due weight to motives of policy and the necessity for subordination.
This latter consideration, perhaps, requires the killing should be atthe instant; for it may not be consistent with due subordination to allow a slave, after he is extricated from his difficulty and is no longer receiving blows or in danger, to return and seek a combat. A wild beast wounded or in danger will turn upon a man, but he seldom so far forgets his sense of inferiority *Page 279 
as to seek a combat. Upon this principle, which man (404) has in common with the beast, a slave may, without losing sight of his inferiority, strike a white man when in danger or suffering wrong; but he will not seek a combat after he is extricated.
If the witness Dick, while one white man was holding his hands and the other was beating him, had killed either of them, there would have been no difficulty in making the application of the above principles, and deciding that the killing was but manslaughter, and of a mitigated grade, contrasted with Will's case, who, although he did not seek the combat, but was trying to escape, killed his owner with a knife, after being guilty of willful disobedience; and the conclusion would derive confirmation from the reasoning of Judge Gaston, in Jarrott's case, where the prisoner had it in his power to avoid the combat, if he would, and struck several blows afterthe white man was prostrated.
In making the application of the principles before stated to the case of the prisoner, another principle is involved. The prisoner was not engaged in the fight; he was the associate and friend of Dick, and was present and a witness to his wrongs and suffering.
We have seen that had he been a white man, his offense would have been but manslaughter, "because of the passion which isexcited when one sees his friend assaulted." (See the case cited from 12 Coke, 87, and the other authorities.) But he is a slave, and the question is, Does that benignant principle of the law by which allowance is made for the infirmity of our nature, prompting a parent, brother, kinsman, friend, or even a stranger to interfere in a fight and kill, and by which it is held that, under such circumstances, the killing is ascribed to passion and not to malice, and is manslaughter, not murder; does this principle apply to a slave? or is he commanded, under pain ofdeath, not to yield to these feelings and impulses of (405) human nature under any circumstances? I think the principle does apply, and am not willing, by excluding it from the case of slaves, to extend the doctrine of constructive murder beyond the limits now given to it by well-settled principles. The application of this principle will, of course, be restrained and qualified to the same extent and for the same reasons as the application of the principle of legal provocation before explained. A slight blow will not extenuate; but if a white man wantonly inflicts upon a slave, over whom he has no authority, a severe blow, or repeated blows under unusual circumstances, and another, yielding to the impulse natural to the relations *Page 280 
above referred to, strikes at the instant and kills, without evincing, by the means used, great wickedness or cruelty, the offense is extenuated to manslaughter.
In 1 East. P. C., 292, and in 1 Russell on Crimes, 502, it is said: "After all, the nearer or more remote connection of the parties with each other seems more a matter of observation to the jury, as to the probable force of the provocation and the motive which induced the interference of a third person, than as furnishing any precise rule of law grounded on such a distinction."
The prisoner was the associate or friend of Dick; his general character was shown to be that of an obedient slave, submissive to white men; he had himself received several slight blows, without offense on his part, to which he quietly submitted; he was present from the beginning; saw the wanton injury and suffering inflicted upon his helpless, unoffending and unresisting associate; he must either run away and leave him at the mercy of two drunken ruffians, to suffer, he knew not how much, from their fury and disappointed lust (the hour of the night forbade the hope of aid from white men) or he must yield to a generous impulse and come to the rescue. He used force (406) enough to release his associate and they made their escape, without a repetition of the blow. Does this show he has the heart of a murderer? On the contrary, are we not forced, in spite of stern policy, to admire, even in a slave, the generosity which incurs danger to save a friend? The law requires a slave to tame down his feelings to suit his lowly condition, but it would be savage to allow him, under no circumstances, to yield to a generous impulse.
I think his Honor erred in charging the jury that, under the circumstances, the prisoner was guilty of murder, and that there was no legal provocation. For this error the prisoner is entitled to a new trial. He cannot, in my opinion, be convicted of murder without overruling Hale'scase and Will's case. It should be borne in mind that in laying down rules upon this subject they must apply to white men as a class, and not as individuals; must be suited to the most degraded as well as the most orderly. Hence, great caution is required to protect slave property from wanton outrages, while, at the same time, due subordination is preserved.
It should also be borne in mind that a conviction of manslaughter is far from being an acquittal; it extenuates on account of human infirmity, but does not justify or excuse. Manslaughter is felony. For the second offense life is forfeited.
I think there ought to be a new trial. *Page 281